STATE OF NORTH CAROLINA v. JAMES EDWARD JAYNES

No. 194A92

(Filed 8 December 1995)

**1. Appeal and Error § 155 (NCI4th)— conversation between men and jurors—court's failure to ascertain substance— waiver of error**

Defendant waived any error in the trial court's failure to conduct an inquiry into the substance and possible prejudicial impact of a conversation between one or more jurors and two men, one of whom was a defense witness, where the trial court warned the men that they would be jailed if they again talked to jurors; the trial court denied the prosecutor's request that it inquire further into the matter; defense counsel did not object to the trial court's action or request any further inquiry into the alleged conversations but answered negatively when asked by the court whether there was anything further on the issue; and defendant has not contended that the trial court's inaction amounted to plain error. N.C. R. App. P. 10(b)(1) and 10(c)(4).

**Am Jur 2d, Appellate Review § 614.**

STATE v. JAYNES

[342 N.C. 249 (1995)]

**2. Criminal Law § 78 (NCI4th)— pretrial publicity—denial of change of venue**

The trial court did not err by denying defendant's motion for a change of venue or a special venire for his murder trial because of pretrial publicity where defendant introduced nineteen newspaper articles or letters to the editor and the transcripts of ten radio or television reports concerning the victim's murder, including letters to the editor written by defendant's ex-wife and daughters; the prosecutor and defense counsel asked all prospective jurors whether they had heard or read about defendant's case and whether they had formed any opinions which would prevent their giving defendant a fair trial; three prospective jurors who stated that they had formed opinions were excused; and even though some prospective jurors indicated they had read or heard about the murder, all jurors who actually served on the jury either stated that they had not formed an opinion or that they had formed an opinion but could set it aside and make a decision as to defendant's guilt solely from the evidence presented at trial. The best and most reliable evidence as to whether existing community prejudice will prevent a fair trial can be drawn from prospective jurors' responses to questions during the jury selection process. N.C.G.S. § 15A-957.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

**3. Jury § 102 (NCI4th)— jury selection—subjective responses to pretrial publicity—disallowance of improper or repetitious questions**

In a prosecution for murder and other crimes wherein a prospective juror indicated that she was familiar with the basic facts of the crimes due to newspaper and television coverage of those crimes, the trial court did not err by sustaining an objection to defense counsel's questions as to what the juror's reaction had been when she heard of the crimes and how she felt about a person who could do such things where the court allowed extensive questioning of the juror with regard to the influence, if any, that media coverage might have had upon her as well as with respect to any other biases she might have had, and the objections sus-

tained by the court were to questions which were not proper as to form or tended to be repetitious.

**Am Jur 2d, Jury § 210.**

**4. Jury § 142 (NCI4th)— jury selection—death penalty for crime—improper attempt to stake out juror**

The trial court did not err by sustaining an objection to defense counsel's question as to whether a prospective juror had "any opinion as to whether a person accused of this crime should receive the death penalty" since the question improperly sought to stake out the juror as to the appropriate penalty to be imposed prior to any evidence being received, and it was unnecessary for defendant to receive an answer to this question in order to make an informed decision as to whether to use a peremptory challenge.

**Am Jur 2d, Jury § 279.**

**5. Jury § 102 (NCI4th)— jury selection—effect of pretrial publicity—disallowance of repetitious questions**

The trial court did not err by sustaining the State's objections to certain questions by defense counsel to a prospective juror as to whether what he had read or heard about the crimes in question had caused him to form any beliefs or opinions or would influence him in the decision of the case where the questions to which the trial court sustained objections were repetitious questions which were fully answered by the prospective juror in response to other questions by defense counsel.

**Am Jur 2d, Jury § 210.**

**6. Jury § 102 (NCI4th)— jury selection—reason for reference to "murder"—question disallowed—other similar testimony**

The trial court did not err in sustaining an objection to defense counsel's question to a prospective juror, "You said that you saw there was a murder or read there was a murder and a trailer was burned. Why did you call it a murder?" where, at another point, defense counsel was permitted to ask the juror whether he had formed an opinion that there was a murder in this case based upon what he had read or heard.

**Am Jur 2d, Jury § 210.**

**7. Jury § 203 (NCI4th)— jury selection—opinion on defendant's guilt—ability to set aside—denial of challenge for cause**

Assuming *arguendo* that a prospective juror in a capital trial had formed an opinion on defendant's guilt from pretrial publicity, the trial court did not err in denying defendant's challenge of the juror for cause where the juror stated clearly and unequivocally that he could set aside that opinion and reach a decision based solely on the evidence presented at trial.

**Am Jur 2d, Jury § 294.**

**8. Evidence and Witnesses § 623 (NCI4th)— summary denial of motion to suppress at trial—same issue determined in pretrial hearing**

The trial court committed no error, constitutional or otherwise, by summarily denying defendant's motion to suppress an inculpatory letter he wrote to his accomplice on 25 October 1990 where defendant made a pretrial motion to suppress letters he had written to his accomplice while incarcerated on the ground they were improperly solicited by the accomplice acting as an agent of the State; the prosecutor introduced at the pretrial suppression hearing two letters written by defendant to the accomplice on 17 and 24 October 1990; the trial court found upon substantial evidence that the accomplice was not acting as an agent of the State and did not solicit the letters and ruled that the letters were admissible; when the 25 October letter was tendered as evidence at trial, defendant objected and asked for a hearing pursuant to his pretrial motion; there was no remaining legal basis for the motion to suppress at trial because the grounds for the motion were the same as to all three letters and had previously been ruled upon; and defendant was given a full opportunity to present any evidence in support of his grounds for suppression of the letters during the pretrial hearing on his motion. N.C.G.S. § 15A-977(c)(1).

**Am Jur 2d, Motions, Rules and Orders § 45.**

**9. Arson and Other Burnings § 32 (NCI4th); Homicide § 278 (NCI4th)— interval between killing and burning—occupancy of dwelling—first-degree arson—felony murder**

The evidence was sufficient to show that the killing of the victim and the burning of his dwelling were so joined by time and

circumstances as to be part of one continuous transaction and therefore supports a finding that the dwelling was "occupied" within the meaning of N.C.G.S. § 14-58, and the evidence was thus sufficient to support defendant's conviction of first-degree arson and the trial court's submission of felony murder to the jury predicated on the felony of first-degree arson, where it tended to show that defendant and his accomplice parked their car near the victim's mobile home at approximately 11:00 p.m.; after murdering and robbing the victim, they drove both of his vehicles to another county and then returned for the car in which they had originally arrived; and at that time, which was between 2:00 and 2:30 a.m., defendant burned the mobile home to destroy the evidence. The fact that the time interval between the murder and the arson was as much as three and one-half hours did not prevent a finding based on all the surrounding circumstances that the interval was "short" enough for the murder and the arson to be parts of one continuous transaction.

**Am Jur 2d, Arson § 40.**

**10. Constitutional Law § 189 (NCI4th)— double jeopardy— armed robbery and larceny**

The trial court violated defendant's federal and state constitutional rights to be free of double jeopardy by sentencing him both for armed robbery and for larceny of the victim's two vehicles where the evidence tended to show that defendant and his accomplice loaded items of the victim's personal property into the victim's vehicles and drove them away; the takings of the vehicles and the other items occurred simultaneously and were linked together in a continuous act or transaction; and there was thus only one taking, and the larcenies were lesser-included offenses of the armed robbery.

**Am Jur 2d, Criminal Law § 279.**

**11. Criminal Law § 794 (NCI4th)— acting in concert—actual or constructive presence—instruction not required**

The trial court did not commit plain error in failing to instruct the jury that a defendant's actual or constructive presence at the scene of the crime is required before defendant may be convicted under the theory of acting in concert where all of the evidence was to the effect that defendant was either the perpetrator or that

defendant was present and acted together with an accomplice in committing the offenses.

**Am Jur 2d, Trial §§ 1244 et seq.**

**12. Burglary and Unlawful Breakings § 147 (NCI4th)— instructions—opening door—breaking**

The trial court did not commit plain error by instructing the jury in a first-degree burglary trial that "[w]alking through an open door and opening the same would constitute a breaking and an entry" since opening a partly opened door is a "breaking" and walking through an open doorway is an "entering" under the law of burglary, and taken in context, the trial court's instructions required that the jury find both a breaking and an entering before convicting defendant.

**Am Jur 2d, Burglary § 69.**

**Entry through partly opened door or window as burglary. 70 ALR3d 881.**

**13. Evidence and Witnesses § 3099 (NCI4th)— impeachment—state of mind purpose—repetitious question not allowed**

Assuming *arguendo* that defense counsel's question to a witness as to the state of mind and purpose of defendant's accomplice for breaking into the high school he had attended was competent to show that the accomplice was capable of planning criminal activity and thus to impeach the accomplice's testimony that defendant was the leader in the robbery-murder of the victim, the trial court acted within its discretion to prevent repetitious questioning by its exclusion of this question where the witness had already testified as to the accomplice's purpose for breaking into the school, and other testimony showed that the accomplice was capable of planning criminal activity.

**Am Jur 2d, Witnesses §§ 864, 867.**

**14. Criminal Law § 544 (NCI4th)— unspecified convictions and charges—possible sentences—objections sustained—failure to declare mistrial**

The trial court did not err by failing to declare a mistrial *ex mero motu* in this capital trial when the prosecutor on three occasions asked defense witnesses about unspecified convictions and charges against defendant in another county and the possible sentences defendant faced in that county where the court sus-

tained defendant's objections to the prosecutor's question on each occasion, and no evidence prejudicial to defendant was introduced in response to the prosecutor's questions.

**Am Jur 2d, Trial § 437.**

## 15. Evidence and Witnesses § 52 (NCI4th); Constitutional Law § 161 (NCI4th)— shoes not provided to officers by defendant—testimony not shifting of burden of proof

The trial court's admission of an SBI agent's testimony in response to a question by the prosecutor that neither defendant nor his attorney had given the shoes worn by defendant on the night of the crime to law officers for comparison with shoeprints at the crime scene did not improperly allow the State to shift the burden of proof to defendant in violation of his right to due process but merely allowed the witness to inform the jury of defendant's failure to support his theory of the case.

**Am Jur 2d, Criminal Law § 825; Evidence § 176.**

## 16. Criminal Law § 412 (NCI4th)— opening statement— remark about not guilty plea—no placement of burden on defendant

The prosecutor's remark during his opening statement that defendant "has come here and pled not guilty, denies this offense, and by that plea says that he doesn't know anything about these charges or offenses and didn't have anything to do with it" did not unconstitutionally impose a burden of persuasion on defendant and did not go beyond the proper scope and function of an opening statement.

**Am Jur 2d, Trial § 522.**

## 17. Evidence and Witnesses § 2471 (NCI4th)— prosecution witnesses—findings that sentencing concessions not made—supporting evidence

There was no merit to defendant's contention that the prosecutor denied his state and federal due process rights by failing to disclose sentencing concessions made to two prosecution witnesses in exchange for their cooperation and testimony against defendant where substantial evidence supported the trial court's findings and conclusions that no express or implied plea or sentencing concessions were made to either prosecution witness prior to testimony by the witness in defendant's trial.

**Am Jur 2d, Criminal Law § 222.**

**18. Criminal Law § 1323 (NCI4th)— capital sentencing—statutory militating circumstances—instruction permitting finding of no mitigating value—prejudicial error**

The trial court erred by instructing the jury in a capital sentencing proceeding that it was for the jury to decide whether any statutory mitigating circumstances it found to exist had mitigating value. Furthermore, this error was prejudicial and entitled a defendant sentenced to death to a new capital sentencing proceeding where it is impossible to determine whether the jurors found some of the statutory mitigating circumstances submitted to exist but decided to give them no mitigating value.

**Am Jur 2d, Trial §§ 1441 et seq.**

Justices LAKE and ORR did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Ferrell, J., on 23 April 1992 in Superior Court, Polk County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals on additional convictions for first-degree arson, first-degree burglary, robbery with a dangerous weapon, and two counts of larceny of an automobile was allowed 9 July 1993. The appeal was heard in the Supreme Court 7 December 1993. On 2 March 1994, defendant filed a motion for appropriate relief with the Supreme Court, which remanded the case on 11 May 1994 to the Superior Court, Polk County, for an evidentiary hearing. The Superior Court denied the motion for appropriate relief in an order entered by Llewellyn, J., on 12 June 1995.

*Michael F. Easley, Attorney General, by Steven F. Bryant, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor and Janine M. Crawley, Assistant Appellate Defenders, for defendant-appellant.*

MITCHELL, Chief Justice.

On 28 January 1991, defendant James Edward Jaynes was indicted for first-degree murder, first-degree arson, first-degree bur-

glary, robbery with a dangerous weapon, and two counts of felonious larceny of an automobile. He was tried capitally at the 6 April 1992 Criminal Session of Superior Court, Polk County. On 16 April 1992, the jury returned verdicts finding defendant guilty of all offenses as charged. Defendant was convicted of first-degree murder on the theory of premeditation and deliberation and under the felony murder doctrine. Following a separate capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of death. On 23 April 1992, the trial court entered judgments sentencing defendant to death for first-degree murder and to consecutive sentences of imprisonment of fifty years for first-degree arson, fifty years for first-degree burglary, forty years for robbery with a dangerous weapon, and ten years for each count of felonious larceny of an automobile. Defendant appealed to this Court as a matter of right from the first-degree murder conviction. On 9 July 1993, we allowed defendant's motion to bypass the Court of Appeals with respect to his appeals from the remaining convictions.

The State's evidence tended to show *inter alia* that in October 1990, Paul Frederick Acker, the victim, was in the process of clearing land for a cattle farm. Several buildings, including a barn and a workshop, had already been built on the farm. Acker was living there alone in a mobile home until his house could be constructed. He kept numerous personal items as well as tools and equipment in his mobile home and in other buildings on the farm. He also owned a 1985 Volvo automobile and a 1988 Ford pickup truck.

Jerry Nelon was employed by Acker in the summer of 1990 to clear land off of Highway 108. Nelon's work crew included prisoners on work release from the Spindale Prison Camp in Spindale, North Carolina. One of these men was Dan Marr.

Shane Smith testified at trial that he and defendant James Edward Jaynes had gone to school together. In February 1990, Smith began dating defendant's cousin. From that time on, Smith and defendant saw each other often. Because defendant had moved away from home and had no car, he frequently asked Smith for transportation.

About three weeks prior to 10 October 1990, defendant informed Smith that Acker's farm was a potential break-in site. Defendant asked Smith if he could borrow Smith's car to locate the farm, but Smith refused. At this point, defendant informed Smith that Dan Marr had told him about the farm and had previously worked there. Smith

took defendant to see Dan Marr, and the three of them discussed going to Acker's farm. Following the discussion, Smith, accompanied by Marr and defendant, drove to the farm.

During the next two and one-half weeks, defendant and Smith made approximately four trips to Acker's farm. They walked on the property and entered sheds, outbuildings, and Acker's mobile home. During these trips, defendant and Smith observed personal property that they wanted to take for Marr and themselves.

On 10 October 1990, defendant went to Smith's workplace. Defendant told Smith to pick him up at Philip Doster's mobile home, which was located in the same mobile home complex where defendant lived. Smith picked up defendant at about 10:15 p.m., and they went to Acker's farm in Polk County. Defendant was armed with both a .25-caliber pistol and a .22-caliber rifle.

At approximately 11:00 p.m., Smith and defendant arrived at Acker's property. They parked about 250 yards from Acker's mobile home and walked along the driveway toward it. When they reached the mobile home, they saw Acker's Volvo and truck but saw no one outside the home. No lights were on inside, and the doors were closed. Defendant told Smith that he was going to knock on the front door and say that his car was stuck. He would then leave if anyone answered. Smith went to the rear of the mobile home to see if lights came on when defendant knocked on the door. Defendant knocked and asked if anyone was home. He then ceased knocking on the door, and for a few moments it was quiet.

Smith next heard a gunshot and saw a light come on in the mobile home. He heard defendant call his name, and he went around the home and entered the front. There, he saw Acker lying on his back and not moving. Smith also saw defendant holding the rifle and standing next to Acker's body. Defendant put the rifle down and picked up the pistol. Thereafter, defendant fired at the victim's body. Smith closed his eyes when the shots were fired. Defendant next gave Smith the pistol and ordered him to fire it. Smith fired once and then ran outside. A moment later, Smith heard two more shots fired from inside the mobile home. Defendant then came outside and warned Smith that he must not say anything about the events that had just occurred.

Defendant then reentered the mobile home, while Smith stayed on the front porch. Smith asked defendant to cover the body.

Defendant laughed and stated that "it was no big deal." Thereafter, defendant covered the body with a blanket.

Next, defendant asked Smith to drive Acker's truck over to Acker's workshop and load it, and Smith complied. Meanwhile, defendant loaded Acker's Volvo with personal items from Acker's mobile home. After Acker's truck and car were loaded, defendant and Smith drove the vehicles to Rutherford County. Defendant drove the Volvo while Smith drove the truck. They left Smith's car parked beside the road near Acker's farm. Smith followed defendant to a logging road near Marr's house, where they left the loaded truck. Defendant then took Smith back to Polk County in Acker's Volvo to retrieve Smith's car.

Defendant and Smith arrived at the victim's farm at approximately 2:00 a.m. on 11 October 1990. Before taking Smith to the place where they had previously parked, defendant returned to Acker's residence. Defendant found a two-and-one-half gallon gasoline can. He then told Smith to meet him at the bottom of the hill. As Smith was walking down the road, he turned and saw the mobile home in flames. Smith then ran to the car. He later asked defendant why he had burned the mobile home, and defendant stated, "To destroy any evidence."

Smith retrieved his car and followed defendant back to Rutherford County. They left the Volvo on the logging road near Dan Marr's residence. Afterwards, Smith drove defendant to his grandmother's home. Defendant took the .25-caliber pistol, while Smith kept the .22-caliber rifle in his car until 13 October, when he hid it under a sofa in his parents' living room.

On 12 October 1990, defendant and Smith discussed where to put the property they had taken from the victim's farm. They had planned to store some of the stolen items in a barn near Dan Marr's house, but Marr refused to let them do so. Instead, they took the truck to an abandoned house near Oak Springs Road in Rutherford County and unloaded the stolen items there. Defendant and Smith covered the stolen items with plastic bags and took the truck back to the location near Marr's home.

Larry Marelli, who worked for the victim, testified that he drove to Acker's mobile home at approximately 7:50 a.m. on 11 October 1990 and found it on fire. Marelli observed that the victim's car and truck, along with certain other items, were missing and that the door

to the workshop was open. After observing the scene, Marelli returned to his home to call the police. Law enforcement officers arrived at Acker's mobile home within five minutes. At approximately 10:05 a.m., SBI Agent Mika Elliott examined the crime scene and discovered the victim's body there. He found a two-and-one-half gallon gasoline can inside the mobile home. He also discovered that the telephone line had been cut.

On 13 October 1990, a deer hunter discovered the items of stolen property defendant and Smith had left covered by plastic bags near the Oak Springs Road site and reported it to the Rutherford County Sheriff's Department. Thereafter, Detective R.H. Epley and Detective Jake Gamble went to the site where the property had been found. The officers also contacted Philip Doster, who directed them to the old logging road where they found the victim's Volvo.

At approximately 6:00 p.m., Detective Epley and SBI Agent Bruce Jarvis began a surveillance of the area where the victim's Volvo had been discovered. At about 8:00 p.m., the officers observed a car back up the road and stop near the Volvo. Defendant and Smith then got out of the car that had backed up the road. They went to the Volvo and unlocked and opened its trunk. The officers then arrested defendant and Smith.

Philip Doster testified that in October 1990, he was the manager of a mobile home complex in Rutherford County. Defendant had moved to the complex in the summer of 1990. Doster often socialized with defendant and Smith. In October, defendant offered to ·sell Doster a weed eater, a chain saw, and a car battery. Doster and defendant drove in Doster's truck to two different locations in Rutherford County. At one location, Doster saw a pickup truck with tools and other goods. At the other location, Doster saw a Volvo. Defendant opened the trunk of the Volvo and showed Doster a computer and a stereo.

Doster ultimately bought the weed eater, the chain saw, and the car battery. He said that he bought the items from defendant on behalf of the Rutherford County Sheriff's Department because the Department was interested in recovering stolen property and had promised to reimburse him for property that he purchased. Doster asked defendant how he had acquired the goods in the vehicles, and defendant responded that he "had to kill a guy to get [them.]" Defendant told Doster that defendant and Smith had gone to a man's mobile home intending to rob him. Defendant had carried a .22-

caliber rifle, and Smith had carried a .25-caliber pistol. Smith had knocked on the door and told the man who answered that his truck had broken down and he needed help. As the man began to walk back down the hallway of his mobile home, defendant shot him with the rifle. The victim did not die, so defendant shot him again. Defendant then called for Smith to enter the mobile home and directed him to shoot the victim. Doster testified that either Smith or defendant told Doster that one of them shot the victim twice, once in the shoulder and once in the head. Defendant also told Doster that he and Smith had poured gasoline on the victim after they shot him and that they had then set fire to the mobile home.

Doster testified that he had warned defendant that he would tell the authorities all that he knew if he was ever questioned about what defendant had told him. Defendant had responded that he could not be prosecuted because the evidence that could convict him had been destroyed.

Doster stated that in September 1990, defendant had told him about a place owned by a millionaire from New York that he planned to "check out." Doster later heard defendant say that he would murder someone and become rich. On another occasion, defendant told Doster that he and Smith had been to that particular man's home and had entered the home, taken a few dollars, and left. Doster recalled defendant saying that someone was going to pick him up from the mobile home complex and take him to see the place. Doster also had seen defendant with a .22-caliber rifle a few weeks prior to the murder.

Curtis David Barker testified that he had been an inmate at the Polk County jail and had shared a cell with defendant on 13 and 14 October 1990. Barker asked defendant why he was there, and defendant replied that he had been charged with murder and arson. Defendant explained that he had been found in possession of stolen property. Barker then commented that from what he had heard, defendant could only be charged with receiving stolen goods. Defendant responded, "No, I'm guilty of it all. It was premeditated, we knew what we [were] doing when we were doing it."

Later, defendant related to Barker that he and Smith had planned to rob a certain person's mobile home. Defendant explained that he and Smith had been to the mobile home prior to the killing. They had realized that they would need to kill the occupant to carry out the robbery because he never left the residence for long periods of time.

**STATE v. JAYNES**

[342 N.C. 249 (1995)]

Defendant said that he had a .22-caliber rifle and a .25-caliber pistol. On the night of the murder, defendant and Smith watched the mobile home from the woods for a while and then approached the front door. Smith knocked on the door. When the occupant answered, Smith said that he had car trouble and asked to use the telephone. Defendant said that as Smith entered the home, he "turned around and fired two shots into the man." The victim told them not to kill him, but defendant told Smith to "[g]o ahead and get it over with." Next, defendant and Smith removed various items of personal property from the mobile home, placed them into the victim's two vehicles, and drove the vehicles off the property. Defendant and Smith then returned to the mobile home, obtained gasoline from the barn, poured the gasoline on the body and throughout the mobile home, and set the mobile home on fire. On either the 15th or 16th of October, Barker reported to Deputy Sheriff James Carter what defendant had said during their conversation.

On 12 October 1990, Dr. Robert Thompson, a forensic pathologist, performed an autopsy on the victim's body. Dr. Thompson testified that the body was burned after the victim's death. He testified that two bullets were found in the victim's brain. One bullet was consistent with a .25-caliber bullet, and the other was deformed to the extent that the caliber could not be determined. Dr. Thompson opined that Acker had died as a result of the gunshot wounds to the head. Other evidence introduced at trial is discussed at later points in this opinion where it is relevant.

[1] By an assignment of error, defendant contends that the trial court erred in failing to conduct an inquiry into the substance and possible prejudicial impact of a conversation between one or more jurors and two men, one of whom was a defense witness. This issue is not properly before this Court.

The record indicates that during the trial, the trial court was informed that two men had been seen talking to one or more of the jurors. The trial court warned the men that they would be jailed if they did so again. The prosecutor requested that the trial court inquire further into the matter because the prosecutor had seen one of the men talking with defense counsel earlier. The trial court declined to do so.

Defendant did not object to the trial court's action or request any further inquiry into the alleged conversations. To the contrary, after direct questioning by the trial court as to whether there was anything

further for defendant on this issue, defendant's counsel responded, "No, sir."

As a result of defendant's failure to object at trial, this purported error has been waived. *State v. Gibbs*, 335 N.C. 1, 49, 436 S.E.2d 321, 349 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994); *State v. Oliver*, 309 N.C. 326, 334, 307 S.E.2d 304, 311 (1983); N.C. R. App. P. 10(b)(1). Even alleged errors arising under the Constitution of the United States are waived if defendant does not raise them in the trial court. *State v. Upchurch*, 332 N.C. 439, 421 S.E.2d 577 (1992); *State v. Mitchell*, 317 N.C. 661, 346 S.E.2d 458 (1986).

Rule 10(c)(4) of the North Carolina Rules of Appellate Procedure provides:

In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error where the judicial action questioned is *specifically and distinctly* contended to amount to plain error.

N.C. R. App. P. 10(c)(4) (emphasis added); *accord Gibbs*, 335 N.C. at 49, 436 S.E.2d at 349. Defendant has not contended that the trial court's inaction here amounted to plain error. This assignment of error has been waived and is dismissed.

[2] By another assignment of error, defendant contends that the trial court erred in denying his motion for a change of venue or, in the alternative, for a special venire to be drawn from Henderson County. The trial court conducted a pretrial hearing and denied defendant's motion. Defendant argues that the trial court abused its discretion and committed reversible error by denying the motion because there was "a reasonable likelihood that the defendant could not have received a fair trial in Polk County."

In support of his motion, defendant introduced nineteen newspaper articles or letters to the editor and the transcripts of ten radio or television reports concerning the murder of Paul Frederick Acker. He contends that the pretrial publicity was emotionally charged, particularly letters to the editor of the *Tryon Daily Bulletin* written by the victim's ex-wife and daughters. Defendant notes that thirty-eight of the forty-eight prospective jurors questioned about the pretrial publicity "indicated that they were familiar with some specifics of the case," while only seven "indicated that they had no information regarding the case." He argues that Polk County is particularly sus-

ceptible to pretrial publicity because "it is a small, sparsely populated county" and many of the prospective jurors knew someone involved in the trial as a party, witness, or attorney.

The statute pertaining to change of venue provides:

If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the prose-cutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or

(2) Order a special venire under the terms of G.S. 15A-958.

N.C.G.S. § 15A-957 (1988).

This Court has stated:

The test for determining whether venue should be changed is whether "it is reasonably likely that prospective jurors would base their decision in the case upon pre-trial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." *State v. Madric*, 328 N.C. 223, 226, 400 S.E.2d 31, 33 (1991). The burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried rests upon the defendant.

*State v. Yelverton*, 334 N.C. 532, 539-40, 434 S.E.2d 183, 187 (1993). Further, we wish to reemphasize here that "[t]he best and most reliable evidence as to whether existing community prejudice will prevent a fair trial can be drawn from prospective jurors' responses to questions during the jury selection process." *State v. Madric*, 328 N.C. at 228, 400 S.E.2d at 34.

Applying the above rules in our review of the newspaper articles and the other publicity concerning this case, we conclude that the trial court did not err in concluding that defendant failed to meet his burden of proving that pretrial publicity prevented his receiving a fair and impartial trial. Each prospective juror was examined in detail during *voir dire*. The prosecutor and defense counsel asked all

prospective jurors whether they had heard or read about defendant's case and whether they had formed any opinions which would prevent their giving defendant a fair trial. The prosecutor in fact excused two prospective jurors because they confessed to having formed opinions based on what they had learned from the newspaper, television, and publicity. Another prospective juror was excused because she stated that she had formed an opinion after she obtained information about the case at her job. Some prospective jurors indicated they had read about or heard of the murder of Acker. However, all jurors who actually served on the jury either stated that they had not formed an opinion or stated that they had formed an opinion but could set it aside and make a decision as to defendant's guilt solely from the evidence presented at trial.

Because the trial court could reasonably conclude that defendant was unable to show that the jurors who actually decided his case were prejudiced, the trial court did not commit error by denying defendant's motion for a change of venue or special venire. This assignment of error is overruled.

By another assignment of error, defendant contends that the trial court erred in sustaining the State's objections to questions posed by his counsel to prospective jurors concerning their subjective responses to pretrial publicity. Defendant argues that this denied him the right to a fair and impartial jury as well as the statutory right to a meaningful exercise of his peremptory challenges. We disagree.

During *voir dire*, counsel for defendant sought to question several potential jurors as to their subjective reactions to pretrial publicity about this case. The trial court allowed defense counsel to conduct individual *voir dire* of prospective jurors regarding their exposure to news media accounts and "word-of-mouth coverage." Numerous objections were lodged by the prosecution and sustained by the trial court.

The trial court has the duty to supervise the examination of prospective jurors. Regulation of the manner and extent of questioning of prospective jurors rests largely in the trial court's discretion. N.C.G.S. § 9-14 (1986); *State v. Young*, 287 N.C. 377, 387, 214 S.E.2d 763, 771 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976). We have stated that:

> The voir dire examination of prospective jurors serves a dual purpose: (1) to ascertain whether grounds exist for challenge for

STATE v. JAYNES

[342 N.C. 249 (1995)]

cause and (2) to enable counsel to exercise intelligently the peremptory challenges allowed by law. *State v. Allred,* 275 N.C. 554, 169 S.E.2d 833 (1969). "Obviously, prospective jurors may be asked questions which will elicit information not, per se, a ground for challenge in order that the party, propounding the question, may exercise intelligently his or its peremptory challenges." *State v. Jarrette,* 284 N.C. 625, [637-38,] 202 S.E.2d 721 [,730] (1974) [,*death sentence vacated,* 420 U.S. 903, 49 L. Ed. 2d 1206 (1976)].

*Young,* 287 N.C. at 387, 214 S.E.2d at 771; *see also* N.C.G.S. § 15A-1214(c) (1986).

Defendant complains that the trial court in the present case limited defendant to: "(1) objective questions concerning the content of . . . [each] juror's knowledge regarding the case, and (2) the ultimate questions of whether . . . [each] juror had predetermined the defendant's guilt and whether . . . [each] juror could put aside prior information or biases and act impartially." We do not agree with this characterization of the trial court's actions.

Although all parties have the right "to inquire diligently of prospective jurors in order to assess their fitness to serve, it is within the court's discretion to control the manner and extent of such inquiry." *State v. Peele,* 54 N.C. App. 247, 249, 282 S.E.2d 578, 580 (1981); *accord State v. Young,* 287 N.C. at 387, 214 S.E.2d at 771. The trial court is given broad discretion in this regard, and its decisions as to the appropriate extent and manner of questioning of prospective jurors "will not be overturned absent an abuse of discretion." *State v. Mash,* 328 N.C. 61, 63, 399 S.E.2d 307, 309 (1991).

[3] Defendant first points out under this assignment of error that prospective juror Marilyn Geodriac, who later served on the jury, indicated in response to questioning that, due to local newspaper and television coverage of the crimes for which defendant was charged, she was familiar with the basic facts surrounding those crimes. Defendant complains that he was not allowed to ask Ms. Geodriac what her reaction had been when she had heard about the crimes or how she felt about a person who could do such things. Defendant further complains that the trial court also sustained objections to certain questions he sought to ask Ms. Geodriac concerning whether she had formed an opinion as to any of the facts of the case or as to whether a person accused of the crimes at issue should receive the death penalty.

We note that the trial court allowed extensive questioning of prospective juror Geodriac with regard to the influence, if any, that such media coverage might have had upon her as well as with respect to any other biases she might have had. For example, counsel for defendant was permitted to ask Ms. Geodriac: "Based upon anything that you may have seen through the media coverage, did it cause you to form an opinion as to the guilt or innocence of Jimmy Jaynes, this defendant?" Her answer indicated that she had formed no such opinion. Counsel for defendant was also permitted to ask Ms. Geodriac: "Could you decide this case based upon the facts or evidence . . . presented at the trial of this matter; or do you thin[k] you may be influenced by what you may have read or heard about this case prior to today?" She answered: "No, I think I could—just by what's presented here." Counsel for defendant asked no further questions of Ms. Geodriac after receiving that answer.

We do not believe that the trial court abused its discrétion in limiting the questioning of prospective juror Geodriac. Although the trial court sustained objections to questions which were not proper as to form or which tended to be repetitious, it permitted counsel for defendant to ask questions of a sufficient number and nature to determine whether the prospective juror was disqualified to serve and to exercise defendant's peremptory challenges intelligently.

[4] Defendant also contends that the trial court erred by sustaining an objection to his question as to whether prospective juror Geodriac had "any opinion as to whether a person accused of this crime should receive the death penalty." The objection was properly sustained, as this question improperly sought to stake out the juror as to the appropriate penalty to be imposed, prior to any evidence being received. *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995); *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 684 (1993). Further, it was unnecessary for defendant to receive an answer to this question in order to make an informed decision as to whether to use a peremptory challenge. *See State v. Quick*, 329 N.C. 1, 16, 405 S.E.2d 179, 189 (1991).

[5] Defendant next complains in support of this assignment of error that he was not permitted to ask prospective juror David Rowe, who ultimately served on the jury, certain questions as to whether what he had read or heard about the crimes in question had caused him to

STATE v. JAYNES

[342 N.C. 249 (1995)]

form any beliefs or opinions or would influence him in the decision of the case. Defendant was permitted, however, to ask: "From the accounts that you read in the newspapers of this case, have you formed or expressed any opinion concerning the guilt or innocence of the crime charged?" Mr. Rowe answered: "Not knowing any of the facts except for what I read in the newspapers, I've not formed any opinions, no." Defendant was then permitted to ask: "Would what you have read in the paper influence your decision making in this matter?" Mr. Rowe answered: "What I read in the newspaper informed me as to what the news media had reported. I'm not sure if it—you would say that has influenced me one way or the other. It informed me of it happening." Defense counsel then asked: "Well, the information that you received, did that cause you to form a belief or opinion?" Mr. Rowe answered: "I believe it happened." Thereafter, Mr. Rowe stated, in response to questioning, that he could not put that belief out of his mind. At a later point, however, in response to questioning by counsel for defendant, Mr. Rowe stated that he would not base his judgment in the case in any way on anything he had read in a newspaper, but would base his decision upon the evidence at trial. Further, he stated several times thereafter, in response to questions by counsel for defendant, that he could set aside any belief or opinion that he had and act solely on the evidence introduced at trial. The questions as to which the trial court sustained objections appear to have been repetitious questions which were properly and fully answered by the prospective juror in response to other questions by counsel for defendant. Accordingly, the trial court did not abuse its discretion in sustaining the objections to those repetitious questions.

[6] Defendant next argues in support of this assignment of error that the trial court erred in sustaining an objection to his question of prospective juror David Neilsen: "You said that you saw there was a murder or read there was a murder and a trailer was burned. Why did you call it a murder?" However, at another point, counsel for defendant was permitted to ask Mr. Neilsen whether he had formed an opinion that there was a murder in this case based upon what he had read or heard. He answered: "I believe it was—as I can recall, no, I don't know that I formed any particular opinion about it. I believe that what was indicated in the—you know—in the paper or on the news." Counsel for defendant then asked: "So is that why you termed it a murder?" Mr. Neilsen answered: "Yes, sir, I didn't even give any thought to why I termed it that really." Again, we find it clear that the trial court permitted proper questions of the prospective juror but

prevented repetitious questions. The trial court did not abuse its discretion in this regard.

In his brief, defendant further argues in support of this assignment of error that he "also attempted to question other prospective jurors on this panel, against whom the defendant exercised peremptory challenges, with respect to their personal opinions regarding the case and as to whether they had been [a]ffected emotionally by the media coverage." He contends that the trial court abused its discretion or otherwise erred by sustaining objections to such questions. Having reviewed the transcript of the jury *voir dire* in its entirety, we conclude that in each instance the questions at issue were either repetitious or improper as to form.

The trial court allowed thorough inquiry into views that would render any prospective juror unable to be fair, consider the evidence, and follow the law. Such questions were sufficient to reveal any bias that a prospective juror might have had and to ensure a fair and impartial jury. *State v. Mash*, 328 N.C. at 64, 399 S.E.2d at 309. Therefore, the trial court did not abuse its broad discretion in controlling the extent and manner of questioning of the prospective jurors.

**[7]** By another assignment of error, defendant contends that the trial court erred in denying his motion to excuse prospective juror Ross Fox for cause. Defendant contends that the prospective juror had formed an opinion, based on pretrial publicity, as to defendant's guilt. Because the prospective juror stated unequivocally that he could be totally objective, we disagree.

During *voir dire*, the following colloquy occurred between counsel for defendant and prospective juror Fox:

Q.   Without telling me what your opinion is in this regard, have you formed an opinion as to the guilt or innocence of Jimmy Jaynes, as he sits here today, in your own mind?

A.   That's very difficult to answer from a point that, yes, I can come in here with a clean slate, but—and also, yes, I have formed somewhat of an opinion, not totally, just on the hearsay. I mean the hearsay from outside that, yes, this is the person who did this action. *And—ah—so I, you know, read that in the paper, I've read his name in the paper; so therefore I would be foolish to say that, no, I have not formed an opinion.*

(Emphasis added.) Thereafter, counsel for defendant asked Mr. Fox if he could set aside whatever opinion he had formed and render a fair and impartial verdict. Without hesitating, Mr. Fox replied: "I would be totally objective, totally objective." In response to other questions by counsel for defendant, Mr. Fox stated that what he had read or heard would not influence his judgment in the case.

Counsel for defendant challenged prospective juror Fox for cause, and the trial court denied that challenge. Defendant then peremptorily excused Mr. Fox. Later, after defendant had exhausted his peremptory challenges, he attempted to renew his challenge for cause. The challenge was again denied.

Defendant argues that prospective juror Fox acknowledged that he had formed an opinion regarding defendant's culpability and, therefore, that the trial court erred in denying his challenge of Mr. Fox for cause. N.C.G.S. § 15A-1212 provides in part:

> A challenge for cause to an individual juror may be made by any party on the ground that the juror:
>
> . . . .
>
> (9)  For any other cause is unable to render a fair and impartial verdict.

Recently, this Court held that

> [t]he granting of a challenge for cause under N.C.G.S. § 15A-1212(9) rests in the sound discretion of the trial court. *See, e.g., State v. Cunningham*, 333 N.C. 744, 753, 429 S.E.2d 718, 723 (1993); *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992); *State v. Quick*, 329 N.C. 1, 17, 405 S.E.2d 179, 189 (1991); *State v. Watson*, 281 N.C. 221, 227, 188 S.E.2d 289, 293, *cert. denied*, 409 U.S. 1043, 34 L. Ed. 2d 493 (1972). We will not disturb the trial court's ruling on a challenge for cause absent a showing of an abuse of that discretion. *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993).

Where the trial court can reasonably conclude from the *voir dire* examination that a prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence, excusal is not mandatory. *State v. Simpson*, 331 N.C. 267, 415 S.E.2d 351 (1992); *see also Mu'Min v. Virginia*, 500 U.S 415, [431], 114 L. Ed. 2d 493, 509, *reh'g denied*, [501] U.S.

[1269], 115 L. Ed. 2d 1097 (1991) (relevant question when trial preceded by extensive pretrial publicity is not whether jurors remember the case but whether they have such fixed opinions that they cannot judge the defendant impartially).

*State v. Green,* 336 N.C. 142, 166-67, 443 S.E.2d 14, 28-29, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 547 (1994).

Here, assuming *arguendo* that prospective juror Fox had formed an opinion as to defendant's culpability, he stated clearly and unequivocally that he could set aside that opinion and reach a decision based solely on the evidence presented at trial. Such answers were sufficient to support the action of the trial court, which heard the answers and observed the prospective juror's demeanor, in denying the challenge for cause. Therefore, we conclude that the trial court did not err by denying the challenge for cause. This assignment of error is overruled.

[8] By another assignment of error, defendant contends that the trial court erred by denying his motion for a hearing on the admissibility of an inculpatory letter he wrote. Defendant contended at trial that the letter had been solicited by an agent of the State in violation of defendant's right to counsel guaranteed by Article I, Sections 19 and 23 of the Constitution of North Carolina and by the Sixth and Fourteenth Amendments to the Constitution of the United States.

Prior to trial, defendant moved to suppress twenty-five letters and oral statements he had made while incarcerated, contending that they were improperly obtained by State agents. He contended that they were solicited by his accomplice, Stanley Shane Smith, and other inmates acting as agents of the State at a time when defendant was represented by counsel. The trial court held a hearing regarding the motion to suppress the letters. The prosecutor asked the court to limit the suppression hearing to the admissibility of two letters written on 17 October 1990 and 24 October 1990, since those were the only letters it intended to introduce. Defendant agreed to a limited hearing, stating that another suppression hearing could be held if the prosecutor attempted to introduce any other letters. The trial court made no ruling as to the scope of the hearing.

The prosecutor introduced the two letters during the hearing on defendant's motion to suppress. In the 17 October letter, defendant urged Smith not to confess. He wrote: "If you didn't say anything, we can beat it in court. They won't cut you a deal on murder or arson."

In the 24 October letter, defendant suggested to Smith that they might explain their presence near the Volvo by stating that they were directed by an anonymous person to drive the Volvo and Ford truck to Charlotte, North Carolina, and park them with the keys inside. They could also say that in exchange for the service, defendant and Smith were to be allowed to keep the merchandise contained in the Volvo.

During the hearing, the prosecutor called Smith as a witness. He testified that he did not solicit the letters and that he was not an agent for a law enforcement agency at any time. Smith said that defendant had given fellow inmate Curtis Barker the 17 October letter and that Barker had delivered it to Smith. Defendant had also sent the 24 October letter to Smith in the same manner. Another inmate, Furmon Henderson, corroborated Smith's testimony. Smith said that he gave the letters that he had received to law enforcement officers. Officer Pruitt further corroborated this testimony. Defendant offered no evidence to refute Smith's testimony. The trial court made findings and concluded that *at no time* was Smith an agent of the State and that defendant's rights were not violated. Therefore, the trial court held that the letters and certain oral statements were admissible.

During the later trial, the prosecutor sought to introduce a third letter that was dated 25 October 1990 and sent to Smith by defendant. In the letter, defendant told Smith not to talk and that the prosecution would make no deals. Defendant further told Smith that they could get out of trouble if they worked together. The trial court denied defendant's motion for a suppression hearing, admitted the letter into evidence, and then denied defendant's motion to strike the letter after it was read into evidence.

Defendant now contends in support of this assignment that the trial court's summary denial of his motion to suppress the third letter was error because a judge may summarily deny a motion to suppress only if there is no legal basis for the motion. He also contends that "precluding a criminal defendant from presenting evidence in support of a motion to suppress is constitutional error" under *Crane v. Kentucky*, 476 U.S. 683, 90 L. Ed. 2d 636 (1986).

N.C.G.S. § 15A-977(c) provides in pertinent part that "[t]he judge may summarily deny the motion to suppress evidence if . . . [t]he motion does not allege a legal basis for the motion." N.C.G.S. § 15A-977(c)(1) (1988). When the third letter—the letter of 25 October—was tendered as evidence at trial, defendant objected

and asked for a hearing pursuant to his pretrial motion. The basis for the pretrial motion was that Smith had been acting as an agent for the State. The trial court, based upon substantial evidence, had previously determined in its findings of fact and conclusions of law that:

> [t]he Witness Smith *at no time* was serving as an agent of the law enforcement agencies of the State of North Carolina; nor did he elicit on their behalf any incriminating statement from the defendant after any charges had been lodged against the defendant and in the absence of counsel. . . . ; but that nevertheless the production of any such incriminating statement was voluntarily made on his own without having been elicited by the Witness Smith.

(Emphasis added.) Furthermore, there was little in the third letter that was not already before the jury as a result of the introduction of the first two letters. Because the grounds for the motion to suppress were the same as to all three letters and had previously been ruled upon, we conclude that there was no remaining legal basis for the motion and no reason for another suppression hearing. Therefore, the trial court properly denied defendant's request for another suppression hearing before the 25 October letter was admitted into evidence. N.C.G.S. § 15A-977(c); *see State v. Hicks*, 333 N.C. 467, 428 S.E.2d 167 (1993) (no error in refusing to conduct *voir dire* where the facts make it apparent that evidence will be admitted).

We further conclude that defendant was not precluded from presenting evidence in support of his motion to suppress in such manner as to be constitutional error under *Crane v. Kentucky*, 476 U.S. 683, 90 L. Ed. 2d 636. Defendant was given full opportunity to present any evidence in support of his grounds for suppression of the letters during the pretrial hearing on his motion. After he tendered his evidence at that hearing, the trial court made findings and conclusions rejecting those grounds. At trial, defendant merely renewed the motion to suppress that had previously been made and denied, and he relied upon the same grounds already rejected by the trial court. We conclude that the trial court committed no error, constitutional or otherwise, by summarily denying defendant's renewed motion to suppress during the trial of this case. This assignment of error is without merit and is overruled.

[9] By another assignment of error, defendant contends that the trial court erred in instructing the jury on the theory of felony murder to the extent that it allowed the jury to rely on the felony of first-degree

arson as the predicate felony supporting that theory. Defendant contends that first-degree arson could not be used in this case as the predicate felony for the felony-murder theory because the evidence at trial was insufficient to support his conviction for first-degree arson. Specifically, he contends that there was no evidence that the burned dwelling was "occupied" for purposes of N.C.G.S. § 14-58 or that the killing and the burning were part of the same criminal incident. Defendant says that the evidence would only support a finding that the time interval between the death of the victim and the burning of the mobile home was too remote, and the relationship between the two events too attenuated, for them to be part of one continuous transaction. We disagree.

When measuring the sufficiency of the evidence to support submission of a charged offense to the jury, the evidence must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence. *State v. Quick*, 329 N.C. at 31, 405 S.E.2d at 197. The test of the sufficiency of the evidence to withstand defendant's motion to dismiss "is the same whether the evidence is direct, circumstantial, or both." *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991).

Our arson statute provides in pertinent part: "There shall be two degrees of arson as defined at the common law. If the dwelling burned was occupied at the time of the burning, the offense is arson in the first degree . . . ." N.C.G.S. § 14-58 (1993). "[F]or purposes of the arson statute, a dwelling is 'occupied' if the interval between the mortal blow and the arson is short, and the murder and arson constitute parts of a continuous transaction." *State v. Campbell*, 332 N.C. 116, 122, 418 S.E.2d 476, 479 (1992). In the present case, the evidence tended to show that the victim was dead at the time the mobile home was burned. Smith estimated that he and defendant parked their car at approximately 11:00 p.m. After murdering and robbing the victim, they drove both of his vehicles to Rutherford County and then returned for the car in which they had originally arrived. At that time, defendant burned the mobile home to destroy the evidence. Smith testified that this occurred between 2:00 and 2:30 a.m.

Construing the evidence in the light most favorable to the State, defendant carried out his plan to murder and rob the victim and then burned the evidence of those crimes as parts of one continuous transaction. The fact that the time interval between the murder and the arson was as much as three and one-half hours did not prevent a find-

ing based on all the surrounding circumstances that the interval was "short" enough for the arson and the murder to be parts of one continuous transaction. In this case, given the extent to which defendant went to hide the stolen property and the complexity of defendant's criminal scheme, the murder and arson were "so joined by time and circumstances as to be part of one continuous transaction," *id.*, and therefore support a finding that the dwelling was "occupied" within the meaning of N.C.G.S. § 14-58. Therefore, the evidence was sufficient to support defendant's conviction for first-degree arson. Accordingly, the trial court did not err in submitting the first-degree murder charge to the jury on the theory of felony murder, predicated on the felony of first-degree arson. This assignment is without merit and is overruled.

[10] By another assignment of error, defendant contends that the trial court erred in denying his motion to dismiss the two charges of felonious larceny against him and by entering judgments for those two larcenies and also for robbery with a dangerous weapon. Larceny is a lesser included offense of robbery with a dangerous weapon. *See State v. White*, 322 N.C. 506, 514, 369 S.E.2d 813, 817 (1988) (overruling *State v. Hurst*, 320 N.C. 589, 359 S.E.2d 776 (1987)). Defendant argues that the robbery with a dangerous weapon and the larcenies of the vehicles in the present case all were part of a single, continuous criminal transaction. Therefore, defendant contends that the larcenies were lesser-included offenses of the robbery with a dangerous weapon and that the trial court violated his federal and state constitutional rights to be free of double jeopardy by sentencing him both for robbery with a dangerous weapon and for the lesser-included offenses of larceny of the victim's vehicles. We agree.

The State charged defendant with one count of robbery with a dangerous weapon for the taking of all items of the victim's personal property other than the vehicles and with separate counts of felonious larceny for the taking of each of the victim's vehicles. Under our law, larceny is a lesser-included offense of robbery with a dangerous weapon. *Id.* " 'A single larceny offense is committed when, as part of one continuous act or transaction, a perpetrator steals several items at the same time and place.' " *State v. Adams*, 331 N.C. 317, 333, 416 S.E.2d 380, 389 (1992) (quoting *State v. Froneberger*, 81 N.C. App. 398, 401, 344 S.E.2d 344, 347 (1986)). The opinion of the majority in *White* explained that although larceny is a lesser-included offense of robbery with a dangerous weapon, convictions of a defendant for both robbery with a dangerous weapon and larceny may be upheld,

but only if the larceny and the robbery with a dangerous weapon "involved two separate takings." *White*, 322 N.C. at 517, 369 S.E.2d at 818.

In the present case, there was no basis on which to distinguish the taking of the smaller items of personal property from the takings of the vehicles. The evidence tended to show that defendant and Smith loaded the victim's property into the victim's vehicles and drove them away. The takings of the vehicles and the other items occurred simultaneously and were linked together in a continuous act or transaction. *But cf. State v. Barton*, 335 N.C. 741, 746, 441 S.E.2d 306, 309 (1994) (holding on the facts of that case that a robbery with a dangerous weapon and larceny involved separate takings and did not violate double jeopardy). Therefore, there was but one taking, and the larcenies were lesser-included offenses of the robbery with a dangerous weapon. *White*, 322 N.C. at 517, 369 S.E.2d at 818. The action of the trial court in sentencing this defendant for the robbery with a dangerous weapon and also for the two counts of larceny for the taking of the vehicles—lesser-included offenses of the robbery—violated federal and state constitutional principles against double jeopardy. Accordingly, we arrest judgment on the two larceny convictions. *See Adams*, 331 N.C. at 333, 416 S.E.2d at 389.

[11] By another assignment of error, defendant contends that the trial court committed reversible error in failing to instruct the jury that a defendant's actual or constructive presence at the scene of the crime is required before defendant may be convicted under the theory of acting in concert. The record reflects that there was no objection to the trial court's instruction. Therefore, our review is limited to review for plain error. *State v. Odom*, 307 N.C. 655, 659-60, 300 S.E.2d 375, 378 (1983). We have previously explained that to reach the level of plain error, the error in the instructions must be "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). Stated another way, the error must be one "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

Having reviewed the trial court's instructions on acting in concert, we detect no plain error. In *State v. Gilmore*, 330 N.C. 167, 409 S.E.2d 888 (1991), defendant took issue with the exact jury instruc-

tion on acting in concert that is at issue in the present case. Gilmore assigned as error the trial court's denial of his request to instruct the jury that he must have been present when the offense was committed for him to be guilty under the theory of acting in concert. In *Gilmore*, this Court concluded that when a defendant is in close enough proximity to the scene of the murder to be able to render assistance to the killer in committing the crime, if needed, he is constructively present. *Id.* at 172, 409 S.E.2d at 890; *see also State v. Bell*, 270 N.C. 25, 153 S.E.2d 741 (1967); *State v. Sellers*, 266 N.C. 734, 147 S.E.2d 225 (1966). In *Gilmore*, we further concluded that "[t]he evidence of [Gilmore's] actual or constructive presence at the scene of the murder was sufficiently strong enough that a charge on this feature of the case was not necessary." *Gilmore*, 330 N.C. at 172, 409 S.E.2d at 890-91.

Similarly, in this case, the evidence tended to show that defendant was at the scene with another man and was actively participating in carrying out the offenses. Overwhelming evidence tended to show that even when Smith and defendant were not actually side by side, defendant, like the defendant in *Gilmore*, was in close enough proximity to the scene to be able to render assistance if needed. A specific charge on defendant's presence was unnecessary, as all of the evidence was to the effect that defendant was either the perpetrator or that defendant was present and acted together with Smith in committing the offenses. Defendant has failed to show plain error. This assignment of error is overruled.

[12] By another assignment of error, defendant contends that the trial court committed reversible error by instructing the jury that the element of breaking required to prove first-degree burglary can be satisfied by evidence of entry through an open door. We disagree.

Defendant challenges the following instruction of the trial court:

Now, members of the jury, the defendant has been accused of First Degree Burglary. I charge you that for you to find the defendant guilty of First Degree Burglary, the state must prove these things beyond a reasonable doubt: First, that there was a breaking and an entry by the defendant. Second, that it was a dwelling house that was broken into and entered. A breaking need not be actual; that is, the person breaking need not physically remove the barrier himself. *Walking through an open door and opening the same would constitute a breaking and an entry.* Third, that the breaking and entering was during the night

time. Fourth, that at the time of the breaking and entering, the dwelling was occupied. Fifth, that the owner did not consent to the breaking and entering. And, sixth, that at the time of the breaking and entering, the defendant intended to commit larceny, which is defined to be the taking and carrying away of the personal property of another, without his consent, with the intent to deprive the owner of its possession permanently, the taker knowing that he was not entitled to take it.

(Emphasis added.) Defendant contends that with this instruction, the trial court equated the element of breaking with the element of entering, thereby removing breaking from the jury's consideration as a distinct element.

Again, the record reflects that there was no objection to the instruction. Therefore, our review is limited to review for plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375.

Having reviewed the trial court's instructions on first-degree burglary, we find no plain error. Burglary is the breaking and entering during the nighttime of a dwelling or sleeping apartment with intent to commit a felony therein, and whether the building is occupied at the time affects only the degree of the burglary. *State v. Mumford*, 227 N.C. 132, 41 S.E.2d 201 (1947). A breaking in the law of burglary constitutes any force, however slight, "employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed." *State v. Wilson*, 289 N.C. 531, 539, 233 S.E.2d 311, 316 (1976). Therefore, any use of force, however slight, to open a door in order to enter it clearly would suffice as the breaking required for burglary. *Id.* As a result, the trial court's instruction that "[w]alking through an open door and opening the same would constitute a breaking and an entry" certainly was not plain error; opening a partly opened door is a "breaking" and walking through an open doorway is an "entering" under the law of burglary. Taken in context, the trial court's instructions required that the jury find both a breaking and an entering before convicting defendant. The trial court was "not required to frame its instructions with any greater particularity than [was] necessary to enable the jury to understand and apply the law to the evidence bearing upon the elements of the crime charged." *State v. Weddington*, 329 N.C. 202, 210, 404 S.E.2d 671, 677 (1991). This assignment of error is without merit and is overruled.

[13] By another assignment of error, defendant contends the trial court erred in sustaining the prosecutor's objection to a question he

asked of a defense witness concerning the state of mind of the State's only eyewitness. We do not agree.

Chris Roach testified about break-ins that he and State's witness Shane Smith had committed together. Roach testified that he and Smith had broken into the high school that Smith had attended and had stolen the records of all students whose last names began with the letters "M" through "Z," including Smith's. When counsel for defendant asked Roach why Smith stole the records of all students whose last names began with the letters "M" through "Z," the prosecutor objected and the trial court sustained the objection.

Defendant contends that the trial court's ruling was erroneous. He argues that the answer would have tended to show that Smith was capable of devising a scheme to conceal a break-in and, thereby, would have impeached Smith's testimony that defendant was the leader in the murder and robbery of Paul Acker.

The record shows that at the time the trial court sustained this objection, Roach had already testified as to Smith's state of mind and purpose for breaking into the school. Roach was asked and answered questions on this subject as follows:

Q.  Whose idea was it to commit [the high school] breaking and entering?

A.  It was Shane Smith's.

Q.  Did he tell you why he wanted to do so?

A.  The reason for breaking in was to get some school records. At the time he was then interested in going to a flight school in Florida. It was called Embree Riddle Flight School; and his grades, if I remember right, were not good enough to attend that school. So he thought that if he did away with the records, then there wouldn't be any trace of his grades.

Since Roach had already testified as to Smith's purpose for breaking into the school, the question as to which the objection was sustained was repetitious. Further, Roach testified that he and Smith had committed a number of break-ins together. Roach testified that on one occasion, Smith had promised Roach that if he would not implicate Smith, Smith would arrange for his lawyer to get Roach out of jail. This testimony was sufficient to show that Smith was capable of planning criminal activity. Assuming *arguendo* that the question was proper, the trial court merely acted within its discretion to prevent

repetitious questioning. This assignment of error is without merit and is overruled.

[14] By another assignment of error, defendant contends that the trial court erred in failing to declare a mistrial *ex mero motu* in response to repeated acts of prosecutorial misconduct in his trial. We disagree.

On three occasions, the prosecutor asked defense witnesses about alleged unspecified charges and convictions of defendant in Rutherford County. On the first occasion, the prosecutor asked a witness, "Do you know what felonies Jimmy Jaynes has been convicted of in Rutherford [C]ounty?" Counsel for defendant objected, and the objection was sustained. The next two occasions occurred during testimony given by an administrative assistant for the district attorney's office. The prosecutor asked him, "And would you tell the members of the jury for what offenses [defendant] stands charged in Rutherford County . . . ." The same witness was later asked, "How many years is Mr. Jaynes looking at over there in Rutherford, Mr. Webb?" On each occasion, counsel for defendant objected to the question, and the objection was sustained.

The decision to grant a mistrial is within the trial court's discretion. *State v. Marlow*, 334 N.C. 273, 287, 432 S.E.2d 275, 283 (1993); *State v. Warren*, 327 N.C. 364, 376, 395 S.E.2d 116, 123 (1990). This is particularly true where, as here, defendant has not moved for a mistrial. A mistrial may be granted only when the case has been prejudiced at trial to such an extent that a fair and impartial verdict is impossible. *Marlow*, 334 N.C. at 287, 432 S.E.2d at 283; *State v. Laws*, 325 N.C. 81, 105, 381 S.E.2d 609, 623 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). A trial court's decision regarding a motion for mistrial will not be disturbed on appeal unless the trial court clearly has abused its discretion. *Id.* In the present case, the trial court sustained each of defendant's three objections. As a result, no evidence prejudicial to defendant was introduced in response to the prosecutor's questions concerning defendant's alleged prior crimes or convictions. The trial court's actions were sufficient to remedy any possible harm resulting from the mere asking of the three questions by the prosecutor. The trial court did not err by failing to declare a mistrial. This assignment of error is overruled.

[15] By another assignment of error, defendant contends that the trial court erred by overruling his objection to a question by the pros-

ecutor relating to the lack of evidence presented by defendant. We disagree.

The prosecutor asked SBI Agent Mika Elliott whether defendant or his attorneys had given the shoes defendant had worn on the night of the crime to law enforcement officers for comparison with shoeprints at the crime scene. The trial court overruled defendant's objection, and Elliott answered that they had not done so. Defendant contends that the trial court's ruling improperly allowed the State to shift the burden of proof to defendant, thereby violating defendant's constitutional rights to due process. Defendant recognizes that this Court has rejected similar arguments in prior cases. *E.g., State v. Howard*, 320 N.C. 718, 360 S.E.2d 790 (1987) (holding that the State may bring to the attention of the jury a defendant's failure to produce exculpatory evidence or to contradict evidence presented by the State); *State v. Kuplen*, 316 N.C. 387, 343 S.E.2d 793 (1986) (holding that testimony that defendant did not provide blood sample is admissible). Likewise, we conclude that in this case, the answer to the prosecutor's question merely informed the jury of defendant's failure to support his theory of the case, and it was not error to admit it as evidence. This assignment of error is overruled.

**[16]** By his next assignment of error, defendant contends that the trial court erred in overruling his objection to an improper statement made by the prosecutor during opening arguments. We disagree.

During his opening statement to the jury, the prosecutor stated the following:

> Of course, Mr. Jaynes has come here and pled not guilty, denies this offense, and by that plea says that he doesn't know anything about these charges or offenses and didn't have anything to do with it.

Defendant's objection was overruled by the trial court. Defendant insists on appeal that this statement unconstitutionally imposed a burden of persuasion on him. We do not interpret this statement as carrying any such meaning.

In a criminal jury trial, "[e]ach party must be given the opportunity to make a brief opening statement." N.C.G.S. § 15A-1221(a)(4) (1988). Rule 9 of the General Rules of Practice for the Superior and District Courts specifically provides for an opening statement:

At any time before the presentation of evidence counsel for each party may make an opening statement setting forth the grounds for his claim or defense.

. . . .

Opening statements shall be subject to such time and scope limitations as may be imposed by the court.

Gen. R. Pract. Super. and Dist. Ct. 9, 1995 Ann. R. N.C. 7. Further, this Court has concluded that:

"While the exact scope and extent of an opening statement rest largely in the discretion of the trial judge, we believe the proper function of an opening statement is to allow the party to inform the court and jury of the nature of his case and the evidence he plans to offer in support of it. It should not be permitted to become an argument on the case or an instruction as to the law of the case."

*State v. Paige*, 316 N.C. 630, 648, 343 S.E.2d 848, 859 (1986) (quoting *State v. Elliott*, 69 N.C. App. 89, 93, 316 S.E.2d 632, 636, *disc. rev. denied and appeal dismissed*, 311 N.C. 765, 321 S.E.2d 148 (1984)) (citation omitted); *accord State v. Gladden*, 315 N.C. 398, 417, 340 S.E.2d 673, 685, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

In opening remarks, counsel are permitted a limited preview of the evidence and allowed to state the "legal claim or defense in basic terms." *Paige*, 316 N.C. at 648, 343 S.E.2d at 859 (permissible for counsel in opening statement to state that the defendant "would rely on the presumption of innocence"). "[I]n previewing the evidence, counsel generally should not (1) refer to inadmissible evidence, (2) 'exaggerate or overstate' the evidence, or (3) discuss evidence he expects the other party to introduce." *State v. Freeman*, 93 N.C. App. 380, 389, 378 S.E.2d 545, 551 (citations omitted), *disc. rev. denied*, 325 N.C. 229, 381 S.E.2d 787 (1989). We conclude that the remark of the prosecutor did not violate any of these principles. The prosecutor's statement did not go beyond the proper scope and function of an opening statement. Therefore, the trial court did not err in overruling defendant's objection. This assignment of error is overruled.

We next consider defendant's motions for appropriate relief. On 2 March 1994, defendant filed a motion for appropriate relief with this Court. On 11 May 1994, this Court remanded the case to the Superior Court, Polk County, for an evidentiary hearing. In December 1994, the

Honorable James D. Llewellyn held an evidentiary hearing. Defendant then filed a supplemental motion for appropriate relief in the Superior Court, Polk County, on 7 February 1995. By order dated 12 June 1995, Judge Llewellyn denied defendant's motion for appropriate relief and supplemental motion for appropriate relief. On 22 June 1995, this Court granted defendant's motion for supplemental briefing.

[17] In his supplemental brief, defendant contends that the prosecutor denied his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution by failing to disclose sentencing concessions made to prosecution witnesses Stanley Shane Smith and Curtis David Barker in exchange for their cooperation and testimony against defendant.

The trial court made the following pertinent findings of fact regarding codefendant Stanley Shane Smith:

14. There was no explicit or implicit agreement between the State of North Carolina, any law enforcement officer or governmental agency and Stanley Shane Smith, that in return for his testimony against Mr. Jaynes, he would be given any quasi immunity, full immunity or any sentencing concessions.

15. That at no time did Mr. Leonard [the prosecutor] counsel the witness Smith to commit perjury during his testimony against Mr. Jaynes.

16. That in regard to the witness Smith, Mr. Leonard did not conceal anything of an evidentiary nature which should have been revealed to Mr. Jaynes' attorneys during discovery or at the trial of Mr. Jaynes.

The trial court also made the following pertinent findings of fact regarding witness Curtis David Barker:

27. Mr. Leonard did not make any promises to Mr. Barker in return for his testimony against Mr. Jaynes.

. . . .

29. Mr. Leonard did not permit Mr. Barker to commit perjury or to testify in a false light.

30. Mr. Leonard did not enter into any sentencing agreement expressed or implied with Mr. Barker before his testimony in the Jaynes trial.

The trial court then concluded as a matter of law:

1. That perhaps not the wisest course of action was taken by Mr. Leonard, but he at no time engaged in conduct which was in violation of any of the defendant James Edward Jaynes' rights under the United States or North Carolina Constitutions or any of the General Statutes of North Carolina.

2. That at no time prior to his testimony against the defendant Jaynes was there any plea or sentencing concessions made to Stanley Shane Smith by Mr. Alan G. Leonard or any other individual representing the State of North Carolina or any other governmental agency.

3. That at no time prior to his testimony against the defendant Jaynes was there any plea or sentencing concessions made to Curtis David Barker by Mr. Alan G. Leonard or any other individual representing the State of North Carolina or any other governmental agency.

It is well established that when a trial court's findings of fact are supported by competent evidence, even though conflicting, such findings are binding on appeal. *State v. Williams*, 314 N.C. 337, 333 S.E.2d 708 (1985); *State v. Barnett*, 307 N.C. 608, 300 S.E.2d 340 (1983). There was substantial evidence to support the findings of fact made by the trial court; therefore, they are binding on this Court. Further, the findings of fact compelled the trial court's conclusions of law. Accordingly, defendant's motion for appropriate relief, as originally filed and later supplemented, must be denied, and Judge Llewellyn's order of 12 June 1995 is affirmed.

[18] We conclude for the foregoing reasons that defendant's trial was free of prejudicial error. Thus, we now turn to defendant's assignments of error relating to the separate capital sentencing proceeding conducted in this case. Defendant contends that the trial court erred by instructing the jury that it was for the jury to decide whether any statutory mitigating circumstances it found to exist had mitigating value. We agree.

In response to a juror's question about the meaning of mitigation and whether a particular nonstatutory circumstance was mitigating, the trial court twice instructed the jurors to decide whether any of the thirty-seven mitigating circumstances had mitigating value. Specifically, the trial court instructed as follows:

A number of mitigating circumstances listed on the form have been submitted to the jury for its consideration; the same being (1) through and including (37). Now as to these listed circumstances, it is for you to determine from the circumstances and the facts in this case whether or not *any listed circumstance* has mitigating effect. And if one or more of you should determine by a preponderance of the evidence that the mitigating circumstance listed exists and that it has mitigating value, then you would find that it existed and answer so. If none of you finds that, then you would indicate, no, as to that.

(Emphasis added.) Shortly thereafter, the trial court instructed the jury:

I'm not able to answer your question any more clearly than to say that it is for you to determine as a juror whether or not the listed circumstance has mitigating value or effect.

This Court has held that as to a proffered nonstatutory mitigating circumstance—unlike statutory ones—the jurors must first find whether the proffered circumstance exists factually. Jurors who find that such a nonstatutory mitigating circumstance exists must then consider whether it should be given any mitigating weight. *State v. Hill,* 331 N.C. at 418, 417 S.E.2d at 780; *State v. Huff,* 325 N.C. 1, 58-61, 381 S.E.2d 635, 668-70 (1989), *sentence vacated on other grounds,* 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). Thus, a juror may find that a nonstatutory mitigating circumstance exists but may give that circumstance no mitigating value. *State v. Green,* 336 N.C. at 173, 443 S.E.2d at 32; *State v. Mahaley,* 332 N.C. 583, 598, 423 S.E.2d 58, 67 (1992), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 649 (1995).

If a juror determines that a statutory mitigating circumstance exists, however, the juror must give that circumstance mitigating value. *Mahaley,* 332 N.C. at 598, 423 S.E.2d at 67; *State v. Fullwood,* 323 N.C. 371, 396, 373 S.E.2d 518, 533 (1988), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990) (*Fullwood I*). The General Assembly has determined as a matter of law that statutory mitigating circumstances have mitigating value. *State v. Fullwood,* 329 N.C. 233, 238, 404 S.E.2d 842, 845 (1991); *State v. Wilson,* 322 N.C. 117, 144, 367 S.E.2d 589, 605 (1988); *see* N.C.G.S. § 15A-2000(f) (1988). Therefore, jurors must give them some weight in mitigation. Nevertheless, the amount of weight any particular statutory mitigating circumstance is to be given is a decision entirely for the jury. *Fullwood I,* 323 N.C. at 395, 373 S.E.2d at 533.

STATE v. JAYNES

[342 N.C. 249 (1995)]

The trial court, in its instructions in the present case, told jurors that they could elect to give no weight to statutory mitigating circumstances they found to exist. This was contrary to the intent of the statute and settled case precedent. As it is impossible for us to determine whether the jurors found some of the statutory mitigating circumstances submitted to exist but decided to give them no mitigating weight, we are unable to say that the trial court's error was harmless. *See Wilson*, 322 N.C. at 146, 367 S.E.2d at 606. Accordingly, we vacate defendant's sentence of death and remand the first-degree murder case against him to the Superior Court, Polk County, for a new capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000.

In conclusion, our holdings on appeal in the present case are the following:

No. 90CRS1096—First-Degree Murder—No error in the trial; death sentence vacated and case remanded for new capital sentencing proceeding.

No. 90CRS1097, First-Degree Arson—No error.

No. 90CRS1118, First-Degree Burglary—No error.

No. 91CRS466, Robbery with a dangerous weapon—No error.

No. 91CRS467, Felonious larceny—Judgment arrested.

No. 91CRS468, Felonious larceny—Judgment arrested.

Justices LAKE and ORR did not participate in the consideration or decision of this case.