STATE OF NORTH CAROLINA v. CHRISTOPHER PATTON HOLDER

No. COA99-638

(Filed 16 May 200)

**1. Homicide— first-degree murder—short-form indictment**

The trial court did not err in a first-degree murder prosecution by entering judgment on a short-form indictment. Under *State v. Wallace*, 351 N.C. 481, the Fourteenth Amendment does not require a state indictment to list all of the elements or facts which might increase punishment for a crime.

**2. Constitutional Law— right to be present at trial—first-degree murder—excusal of jurors**

A first-degree murder defendant's constitutional right to be present at every stage of his trial was not violated where jury selection commenced on 27 July; prospective jurors summoned for that date who had not been called into the courtroom were kept in a separate room; an additional panel was summoned on 29 July; the court heard in open court requests to be excused; and the court stated for the record that one juror held over who had called the clerk's office with an illness in the family would be excused. The trial court's memorialization of the private communication between the prospective juror, the clerk, and the trial court explained the circumstances of the communication and the reason for excusing the prospective juror, the memorialization was neither questioned nor objected to by defendant or his counsel, and the memorialization disclosed a valid reason for the excusal and that the communication was harmless beyond a reasonable doubt.

**3. Arson— second-degree not submitted—continuous transaction with murder**

The trial court did not err in a prosecution for first-degree arson and first-degree murder by denying defendant's request for second-degree arson to be submitted as a possible verdict where, during the time between the murder and the arson, defendant and an accomplice disposed of the murder weapon, burned their bloody clothes, purchased gasoline to ignite the fire at the victim's house, and set the house on fire. These undisputed facts show that the murder and arson were so joined by time and circumstances as to be part of one continuous transaction so that the house was "occupied" when it was set on fire.

**4. Criminal Law— prosecutor's argument—arson—continuous transaction—no plain error**

There was no plain error in a prosecution for first-degree murder and first-degree arson where the court did not correct a statement by the prosecutor in her closing argument that the judge was going to instruct the jury that this was a continuous transaction. Defendant contended that "continuous transaction" establishes the occupation element for first-degree arson, which had not been proven; even assuming that the prosecutor misstated the law, the court gave proper instructions regarding first-degree arson, thereby curing any prejudice.

**5. Evidence— defendant's state of mind when giving statement**

There was no plain error in a first-degree murder and first-degree arson prosecution where the trial court allowed an officer to testify to defendant's state of mind when he gave his statement. In light of defendant's confession and his trial testimony, the officer's testimony neither constituted a miscarriage of justice nor did it probably cause the jury to reach a different verdict than it otherwise would have.

Appeal by defendant from judgments entered 11 August 1998 by Judge William H. Helms in Anson County Superior Court. Heard in the Court of Appeals 29 March 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General Joan M. Cunningham, for the State.*

*Appellate Defender Malcom Ray Hunter, Jr., by Assistant Appellate Defender Anne M. Gomez, for defendant-appellant.*

MARTIN, Judge.

Defendant was tried capitally at the 27 July 1998 Criminal Session of Anson County Superior Court upon bills of indictment alleging first degree arson, first degree burglary, and first degree murder. On 10 August 1998, the jury returned verdicts finding defendant guilty as charged of all offenses; defendant's first degree murder conviction was based on both premeditation and deliberation and the felony-murder rule. After a sentencing proceeding conducted pursuant to G.S. § 15A-2000 *et seq.*, the trial court entered judgment upon defendant's conviction of first degree murder, disregarding felony murder as a basis for the conviction, and sentenced defendant to life imprison-

STATE v. HOLDER

[138 N.C. App. 89 (2000)]

ment. The trial court also entered judgment upon defendant's convictions of first degree burglary and first degree arson and imposed consecutive sentences of 82 to 108 months for each offense. Defendant appeals.

Summarized only to the extent required for an understanding of the issues raised on appeal, the State's evidence tended to show that on 3 April 1995, Richard Holder, defendant's brother, called Andy Weaver (Weaver) and asked Weaver to bring him a twelve gauge shotgun and an SKS assault rifle which Weaver had been keeping for him. Weaver, accompanied by Donny Carpenter and defendant, drove to Richard Holder's camper with the guns. Richard Holder told the three men that he was preparing to return to Tennessee, where he had previously taken his minor son, Matthew Holder. Richard Holder believed that his son was being sexually abused by Jimmy Burris, who was the boyfriend of Richard Holder's former mother-in-law. Before Richard Holder was able to leave for Tennessee, however, three police officers arrived to arrest him for parental kidnaping. Following a brief and unsuccessful flight attempt, Richard Holder was arrested. Defendant became enraged that his brother had been arrested, cursed the police officers and screamed, "[t]hat son of a bitch (Burris) needs to die for what he did." After the police left, Weaver vowed to kill Burris.

Later the same day, after they had consumed two pints of "Mad Dog 20/20", an alcoholic beverage, Weaver and defendant began to plan to kill Burris. They bought shells for the SKS assault rifle and went looking for Burris. When they were unable to find Burris at his girlfriend's house, defendant and Weaver drove to Burris' house, arriving at approximately 10:00 p.m. Weaver knocked on Burris' door, while defendant remained behind him, concealing the weapon. When Burris answered the door, Weaver claimed that his car had broken down and asked to use the telephone. Burris let Weaver into the house, and defendant followed him inside. Defendant then uncovered the weapon, pointed it at Burris, and said, "[y]eah, mother------, you know what it is, you know what time it is."

Burris asked if defendant was Chris Holder and tried to grab the weapon. A struggle ensued, during which defendant struck Burris in the face several times and Weaver managed to pin him to the floor. Defendant and Weaver debated whether to cut Burris' throat with a knife or shoot him with the SKS assault rifle. Weaver was unable to hold Burris down, however, while defendant searched for a knife, and defendant returned to the room and kicked Burris in the face.

STATE v. HOLDER

[138 N.C. App. 89 (2000)]

Defendant handed the rifle to Weaver and told him to shoot Burris; Weaver returned the weapon to defendant and told him to shoot Burris. By this time, Burris managed to get to his feet and pleaded with the men not to kill him. Defendant pointed the SKS assault rifle at Burris and shot him in the chest, the force of the blast knocking Burris into an adjoining bedroom. Weaver ran out of the house while defendant went into the bedroom and shot Burris five more times. He and Weaver then fled.

Following the shooting, defendant and Weaver threw the SKS assault rifle into the Pee Dee River, and they burned the clothes they had worn at Burris' house. In order to destroy any evidence at Burris' house that might link them to the murder, defendant and Weaver decided to burn the house. They filled an antifreeze container with gasoline and drove back to Burris' house, where defendant poured the gasoline inside the house and set the house afire with Burris' body still inside.

On 4 April 1995, SBI Special Agent T. M. Caulder and Wadesboro Police Detective Charlie Little interviewed defendant about Burris' murder. Defendant initially denied any involvement in Burris' death but he contacted police the following day and, after being advised of his rights and signing a waiver, gave a statement to Detective Little, Wadesboro Police Detective Steve Erdmanczyk and SBI Special Agent Mark Isley in which he admitted his involvement in the murder and provided a detailed account.

Defendant testified in his own behalf; his testimony was generally consistent with the statement he had given the officers, and he explained that he believed Burris had molested his nephew and that he was angry that the police had arrested Richard Holder for parental kidnaping. He also testified that after Richard Holder was arrested, Weaver said repeatedly that they should kill Burris, that he had attempted to get Richard released on bond, but was unsuccessful, and that he told the officers he had killed Burris in order to protect his nephew. Defendant testified that at the time he gave the statement to the officers, he had planned to kill himself. Defendant also offered the testimony of Richard Holder concerning Burris' alleged abuse of Matthew Holder.

I.

[1] Defendant first argues that the trial court erred by entering judgment upon his conviction of first degree murder because the indict-

ment was insufficient to charge the offense of first degree murder. The indictment alleged that defendant "unlawfully, willfully and feloniously and of malice aforethought did kill and murder James Osborn Burris." Defendant argues that because the indictment failed to allege two essential elements of first degree murder, i.e., premeditation and deliberation, his conviction of first degree murder based thereon violates the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 19, 22 and 23 of the North Carolina Constitution. Though he did not object to the form of the indictment at trial, our Supreme Court has held that "the failure of a criminal pleading to charge the essential elements of the stated offense is an error of law which may be corrected upon appellate review even though no corresponding objection, exception or motion was made in the trial division." *State v. Sturdivant*, 304 N.C. 293, 308, 283 S.E.2d 719, 729 (1981).

The North Carolina Supreme Court has, for nearly one hundred years, held the short form indictment authorized by G.S. § 15-144 sufficient to charge both first degree and second degree murder. *See, e.g., State v. Kilpatrick*, 343 N.C. 466, 472, 471 S.E.2d 624, 628 (1996); *State v. Avery*, 315 N.C. 1, 14, 337 S.E.2d 786, 792-93 (1985); *State v. Banks*, 143 N.C. 652, 656, 57 S.E. 174, 176 (1907) (applying Revisal, sec. 3631) ("Both before and since the statute [dividing murder into first degree and second degree], murder is the unlawful killing of another with malice aforethought."). Defendant argues, however, that as a result of the recent United States Supreme Court decision in *Jones v. United States*, 526 U.S. 227, 143 L.Ed.2d 311 (1999), North Carolina's extensive precedent is now invalid. However, our North Carolina Supreme Court has recently considered and rejected a similar argument in *State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326 (5 May 2000) and has held that the Fourteenth Amendment does not require a state indictment for a state offense to list all of the elements or facts which might increase the punishment for a crime. This assignment of error is overruled.

II.

**[2]** Defendant contends his constitutional right to be present at every stage of his trial was violated by the trial court's alleged *ex parte* communication with, and the excusing of, a juror. We find no prejudicial error in the trial court's actions.

Jury selection in this case commenced on the afternoon of 27 July 1998. Prospective jurors summoned for that date, who had not yet

been called into the courtroom for *voir dire*, were kept together in a separate room; an additional panel of jurors was summoned to appear on 29 July in the event a jury could not be obtained from the initial panel. On 29 July, when the new panel reported, the trial court heard, in open court with defendant present, requests from some of the new jurors to be excused from service. After hearing all the requests, the trial court stated:

THE COURT: All right, appears we'll have plenty of jurors without you folks anyway. And so you're free to go, all of you. Thank you. Just note for the record that neither side objected to excusing these jurors. Put on the record, if you would, that prior to entering the courtroom, I mentioned to the attorneys that several people had called in to the clerk's office last night who were being held over in the—we'll call it the jury assembly room. And that some of them had had—one of them came to say one of them— one of them had an illness in the family. So we're just going to excuse them. The defendant wasn't present, but tell him about it. Anything else we need to put on the record about that?

MR. NICHOLS (Defendant's counsel): No, sir.

THE COURT: Do you understand that, sir?

MR. HOLDER: Yes, sir.

THE COURT: Anything you want to ask me about it or ask your lawyers?

MR. HOLDER: No, sir.

The Confrontation Clause of the North Carolina Constitution guarantees a criminal defendant the right to be present at every stage of his capital trial, N.C. Const. art. I, § 23; *see also State v. Atkins*, 349 N.C. 62, 101, 505 S.E.2d 97, 121 (1998), *cert. denied*, 562 U.S. 1147, 143 L.Ed.2d 1036 (1999), and our Supreme Court has long held that a defendant in a capital case may not waive his right to be present. *State v. Boyd*, 332 N.C. 101, 418 S.E.2d 471 (1992). Jury selection is a phase of the trial at which a capital defendant has a right to be present. *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990). Thus, it is error for the trial court to conduct private unrecorded conversations with prospective jurors, even in the absence of objection by the defendant. *State v. Payne*, 328 N.C. 377, 402 S.E.2d 582 (1991). However, the Court has also recognized that such error does not require a new trial where the State can show, beyond a reasonable

doubt, that such error was harmless. *State v. Lee,* 335 N.C. 244, 439 S.E.2d 547, *cert. denied,* 513 U.S. 891, 130 L.Ed.2d 162 (1994). "The State may show that the error was harmless beyond a reasonable doubt where the transcript reveals the substance of the trial court's conversation with the juror, or where the trial judge reconstructs the substance of the conversation on the record." *Id.* at 262, 439 S.E.2d at 555.

In *Lee,* the trial court excused two jurors under circumstances similar to those in the present case. As the clerk called prospective jurors to the box, the trial court disclosed, on the record, that it had excused the jurors, one due to personal illness and the other due to the illness of a family member. The Court held the trial court's disclosure revealed the substance of the communication between the court and the jurors, and that both had been excused upon proper grounds. *Lee* at 262-263, 439 S.E.2d at 555-56. Similarly, in *State v. Hartman,* 344 N.C. 445, 476 S.E.2d 328 (1996), the trial court disclosed on the record that it had excused a juror who had presented a doctor's note. The defendant did not object to the court's memorialization of the communication and the Supreme Court found no reason, therefore, to doubt its accuracy or completeness. The Court held that the memorialization showed that the juror had been properly excused for medical reasons and the trial court's private communication with the juror was harmless beyond a reasonable doubt.

The trial court's memorialization of the private communication between the prospective juror, the clerk and the trial court in the present case explained the circumstances of the communication and the reason for excusing the prospective juror. The memorialization was neither questioned nor objected to by defendant or his counsel. As in *Lee* and *Hartman,* the memorialization disclosed that the prospective juror was excused for a valid reason and that the communication was harmless beyond a reasonable doubt. This assignment of error is overruled.

III.

[3] Defendant also assigns error to the trial court's denial of his request to submit second degree arson as a possible verdict and to instruct the jury with regard to the lesser offense. G.S. § 14-58 (1999) provides:

There shall be two degrees of arson as defined at the common law. If the dwelling burned was occupied at the time of the burn-

ing, the offense is arson in the first degree and is punishable as a Class D felony. If the dwelling burned was unoccupied at the time of the burning, the offense is arson in the second degree and is punishable as a Class G felony.

Our Supreme Court has said:

It is well settled that "a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternative verdicts." *State v. Palmer*, 293 N.C. 633, 643-44, 239 S.E.2d 406, 413 (1977). On the other hand, the trial court need not submit lesser degrees of a crime to the jury "when the State's evidence is positive as to each and every element of the crime charged *and there is no conflicting evidence relating to any element of the charged crime.*

*State v. Drumgold*, 297 N.C. 267, 271, 254 S.E.2d 531, 533 (1979), (quoting *State v. Harvey*, 281 N.C. 1, 13-14, 187 S.E.2d 706, 714 (1972)) (emphasis in original). Defendant argues the evidence would have supported a verdict of second degree arson because a jury could reasonably have concluded that when defendant burned Burris' house with Burris' body inside, the house was "unoccupied" because Burris had been dead for between two and three and a half hours. In essence, defendant argues that the time span between the murder and the arson presented a factual issue for the jury to decide whether the building was "occupied."

In *State v. Campbell*, 332 N.C. 116, 418 S.E.2d 476 (1992), the North Carolina Supreme Court applied for the first time the "continuous transaction doctrine" to a murder-arson situation. In that case, the court held that "a dwelling is 'occupied' if the interval between the mortal blow and the arson is short, and the murder and arson constitute parts of a continuous transaction." *Campbell*, 332 N.C. at 122, 418 S.E.2d at 479. The continuous transaction doctrine was subsequently applied in the case *State v. Jaynes*, 342 N.C. 249, 464 S.E.2d 448 (1995), *cert. denied*, 518 U.S. 1024, 135 L.Ed.2d 1080 (1996), in which the facts are similar in important respects to the facts of the present case. In *Jaynes*, the defendant and an accomplice murdered the victim inside a mobile home, drove away from the scene, and then returned to the mobile home approximately three and a half hours later to burn it. *Jaynes*, 342 N.C. at 274, 464 S.E.2d at 464. The North Carolina Supreme Court upheld the defendant's first degree arson conviction, observing that "given the extent to which the defendant went to hide the stolen property and the complexity of defendant's

criminal scheme, the murder and arson were 'so joined by time and circumstances as to be part of one continuous transaction,' [*Campbell*, 332 N.C. at 122, 418 S.E.2d at 479] and therefore support a finding that the dwelling was 'occupied' within the meaning of N.C.G.S. § 14-58." *Id.* at 275, 464 S.E.2d at 464.

Based on the reasoning underlying *Jaynes*, the trial court correctly denied defendant's request to submit second degree arson as a possible verdict. During the time which elapsed between the murder and the arson, defendant took additional actions designed to further his "criminal scheme," i.e, defendant and Weaver disposed of the murder weapon, burned their blood-soiled clothes, purchased gasoline to ignite the fire at Burris' house, and set the house on fire. As in *Jaynes*, these undisputed facts show "the murder and arson were 'so joined by time and circumstances as to be part of one continuous transaction.' " *Id.* (quoting *Campbell*, 332 N.C. at 122, 418 S.E.2d at 479).

IV.

[4] Defendant also contends the trial court committed plain error when it failed to intervene, *ex mero motu*, to correct an erroneous statement of law made by the prosecutor in her closing argument. The prosecutor argued:

> Now, you might say well, Jimmy Burris was already dead. But ladies and gentlemen, you don't stop being someone just because you're dead. The body was still there. *And the Judge is going to instruct you that this was a continuous transaction, that it was ongoing.* And the fact that Jimmy Burris died during these transactions, these events, doesn't make it any less culpable that they actually succeeded in killing Jimmy Burris. So I'm going to ask you, ladies and gentlemen, to find him guilty of first degree arson (emphasis added).

Defendant contends that the highlighted sentence constituted an erroneous statement of law because "continuous transaction" establishes the "occupation" element for first degree arson, and the State had not proven the "occupation" element of first degree arson beyond a reasonable doubt.

As stated in *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 194-95 (1998), *cert. denied*, 528 U.S. 835, 145 L.E.2d 80 (1996):

> The standard of review when a defendant fails to object at trial is whether the argument complained of was so grossly

improper that the trial court erred in failing to intervene *ex mero motu*. "The impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Hipps*, 348 N.C. 377, 411, 501 S.E.2d 625, 645 (1998) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)). In determining whether the statement was grossly improper, we must examine the context in which it was given and the circumstances to which it refers. *State v. Tyler*, 346 N.C. 187, 205, 485 S.E.2d 599, 609, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 411 (1997); *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995), *cert. denied*, 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996).

Even assuming, *arguendo*, that the prosecutor misstated the law, it was not plain error for the trial court not to intervene *ex mero motu* to correct the argument. The trial court gave proper instructions regarding first degree arson, thereby "cur[ing] any prejudice to defendant which may have resulted from the alleged misstatements of law in the prosecutor's arguments." *Id.* at 452, 509 S.E.2d at 194. Accordingly, this assignment of error is overruled.

## V.

[5] Defendant's final contention is that the trial court erred when it allowed one of the State's witnesses, Officer Isley, to testify as to defendant's state of mind in violation of G.S. § 8C-1, Rule 602. The prosecutor asked Officer Isley, "[w]hat was the defendant's emotional state during [the giving of his statement to police]?" Officer Isley replied, "[h]e was very calm, expressionless. No emotions whatsoever. Not remorseful in any regard." Defendant failed to object to this question and answer at trial, rendering the assignment of error subject to a plain error standard of review. *State v. York*, 347 N.C. 79, 489 S.E.2d 380 (1997). Plain error is error that is "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *Id.* (citations omitted). In light of defendant's confession, as well as his trial testimony concerning his involvement in these crimes, the testimony of Officer Isley neither constituted "a miscarriage of justice" nor did it probably cause the jury to reach a different verdict than it otherwise would have. Therefore, this assignment of error is overruled.

Defendant has abandoned the remaining assignments of error contained in the record. N.C.R. App. P. 28(a). We conclude defendant received a fair trial, free from prejudicial error.

No error.

Judges LEWIS and WALKER concur.