STATE OF NORTH CAROLINA v. VERNELLE LAFARRIS BULLOCK, SR., Defendant

No. COA01-476

(Filed 3 December 2002)

**1. Evidence— cross-examination—alibi witness—bias or prejudice**

The trial court did not abuse its discretion in an attempted first-degree murder and possession of a firearm by a felon while being an habitual felon case by denying defendant's objection on relevancy grounds to cross-examination questions by the State of a defense witness, defendant's girlfriend, that implied the witness had a previous altercation with the victim, defendant's former

**STATE v. BULLOCK**

[154 N.C. App. 234 (2002)]

wife, because the State was allowed to question defendant's alibi witness about events which may have revealed bias or prejudice against the victim of the crime.

**2. Criminal Law— defendant's argument—someone else shot victim**

The trial court did not abuse its discretion in an attempted first-degree murder and possession of a firearm by a felon while being an habitual felon case by failing to allow defendant to argue during closing arguments that the victim's present husband shot the victim, because there was no evidence presented that pointed directly or indirectly to the guilt of anyone other than defendant.

**3. Criminal Law— trial court asking witness questions—no expression of opinion**

A defendant is not entitled to a new trial in an attempted first-degree murder and possession of a firearm by a felon while being an habitual felon case even though the trial court asked a doctor witness questions about the seriousness and the permanency of the victim's injuries, because: (1) the trial court did not express an opinion concerning defendant's guilt or make any statement tending to discredit or prejudice defendant; and (2) the trial court did not violate the restrictions imposed by N.C.G.S. § 15A-1222 nor was defendant prejudiced by the questions.

**4. Homicide— attempted first-degree murder—sufficiency of short-form indictment**

A defendant's attempted first-degree murder conviction is vacated and the case is remanded for sentencing and entry of judgment on attempted voluntary manslaughter based on insufficiency of the short-form indictment, because: (1) the indictment failed to allege the essential element of malice aforethought as required by N.C.G.S. § 15-144; and (2) the jury's verdict of attempted first-degree murder necessarily means that it found all of the elements of the lesser-included offense of attempted voluntary manslaughter.

Appeal by defendant from judgments entered 2 October 2000 by Judge Howard R. Greeson, Jr. in Guilford County Superior Court. Heard in the Court of Appeals 25 March 2002.

STATE v. BULLOCK

[154 N.C. App. 234 (2002)]

*Attorney General Roy Cooper, by Assistant Attorney General Donald R. Teeter, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel R. Pollitt, and Mark E. Hayes, for the defendant-appellant.*

HUDSON, Judge.

Vernelle L. Bullock, Sr. ("defendant") was convicted by the jury of attempted first degree murder and possession of a firearm by a felon while being an habitual felon. The defendant pled guilty to the status of being an habitual felon. The court sentenced him to a total imprisonment of 423 months to 526 months. Defendant appeals his convictions and sentences.

We begin with a summary of pertinent facts. For seven years, defendant was married to the victim, Yvonne Smith; they had two children, Vernelle, Jr., born in 1990, and Dayquinton, born in 1992. Shortly after the birth of Dayquinton, defendant moved away. Ms. Smith obtained a divorce from defendant in 1995 and married Curtis Vincent Smith in 1997. Defendant reappeared in August of 1999 and contacted Ms. Smith. He expressed an interest in reuniting with her and their sons, and she informed him that he could visit with the boys, but that she had remarried and was not interested in resuming a romantic relationship. Defendant began to visit the boys, especially his older son, Vernelle, Jr., about every other weekend. Around the time defendant returned to Greensboro and became involved in the lives of his ex-wife and sons, Ms. Smith's husband moved out of their home. Ms. Smith explained that Mr. Smith was not comfortable with her resuming any friendship with defendant.

Defendant did not pay any child support during the time he was gone, and Ms. Smith agreed for defendant to begin paying support six months after he returned to Greensboro. She testified that from time to time she lent defendant money to help him "get on his feet," and that he always paid her back. Ms. Smith repeatedly rebuffed defendant's advances and his statements of intent to re-establish a romantic relationship with her. After one such advance, Ms. Smith testified that on or about 29 December 1999, defendant came to her house, told Vernelle, Jr. not to call him anymore, and threatened to kill everyone in the house.

Ms. Smith testified that in March of 2000, she and the boys went with defendant to visit his grandmother in Maxton, N.C. During that

trip, defendant became agitated, and told Ms. Smith that he was in love with her and wanted their family to be together. Again, Ms. Smith explained that she had a husband and it would not be right. She said she was okay that time, but described an incident earlier that night, during which defendant asked her to pull over the car and, "he got out of the car, slammed the door, and then he walked over to this field. . . . And he—then he just started jumping up and down and banging his head and, you know, hitting the ground and hollering, and all kind of crap." Defendant's two sons, who were in the car, began to shake and cry. Ms. Smith got out of the car at defendant's request. Again, he professed his love for her. Ms. Smith testified that,

> [t]hen he just grabbed me to the point he almost picked me up off the ground, and it scared me. And I was like, Vernelle, let me go, because you're getting mad. . . . He just kept grabbing and grabbing. Then he let me go. He said, I'm not going to hurt you. I'm not going to hurt you ever again in life. I'm not going to hurt you. I promise you I'm not going to hurt you. You know I love you. You know I love you.

After a while, she calmed him down and they returned to the car.

Ms. Smith testified that on the evening of 28 April 2000, she and her sons were at her sister's house, when defendant repeatedly paged her to talk about repaying a debt, and then he showed up at her sister's door. She spoke with him briefly outside, and Ms. Smith assured defendant that he could pay her back the next week. Defendant asked for a hug or kiss goodbye, and Ms. Smith lightly hugged him. Defendant left, and Ms. Smith and the boys stayed at her sister's house until around midnight, when they went to the house where Mr. Smith was staying. Ms. Smith hoped to stay with her husband for the evening. However, Mr. Smith was on the phone and Ms. Smith only stayed thirty minutes before leaving for her home with the boys at 12:30 or 12:45 in the morning. She put the boys to bed, went to her bedroom to read the Bible and watch television, and fell asleep.

At about 12:50 a.m., Ms. Smith was awakened by knocking on the door. She looked out of her window and saw defendant's truck backed into her driveway. Ms. Smith walked into the living room, turned on a light, and saw defendant standing on her porch. She let him into the house and asked him what was wrong. Defendant did not speak, but walked around her while she was closing and re-locking the door. Ms. Smith testified, "[a]nd I turned around to say, Now, Vernelle, what's—and when I turned around, then that's when I fell. I

said boom—you know, I could feel him shoot me. I didn't know where he had shot me at that point. I just knew I was shot." Ms. Smith later found out that the first shot had been in her left eye. When she fell to the floor, she saw the defendant standing over her and sparks from the gun. She testified that while he was standing over her, she "could see sparks from his continuing to shoot me."

Ms. Smith testified that after defendant shot her several times, she heard him moving around her house and firing the gun repeatedly. She did not know how long he stayed, but he finally left, hitting her in the head with the door as he opened it, and slamming it behind him. Ms. Smith dragged herself across the floor, knocking down a lamp, and tried to rise. She called out for her sons. When the younger boy, Dayquinton, came to her, she asked him to get the older one, Vernelle, Jr. She told the boys that defendant shot her, and asked the older boy to call 911. The boys did as she asked, then put a pillow under her head, wiped up some of the blood with paper towels, and covered her with a blanket.

The police and EMS arrived and took Ms. Smith to the hospital. She learned that she had been shot four times: in the left eye, the back of her head/upper neck, the left leg, and the right arm. Ms. Smith testified that as a result of the shooting, she lost the use of her left eye, had a stroke on the left side of her brain, had difficulty regaining the use of her body for everyday functions, and still suffered a lack of sensation that made it difficult for her to use her leg and arm. At the time of defendant's trial, she expected to undergo at least two more surgeries to reconstruct the left side of her face where the bullet had destroyed her eye and eye socket. After the shooting, Mr. Smith moved back in and took care of his wife.

Ms. Smith's two sons also testified. Vernelle, Jr. testified that his father showed him a gun that he kept in a case in the basement of the house he lived in at the time. On cross-examination, he said that his dad "just said it was for—it was his girlfriend's for if my mom had came over there that she would shoot her." He also testified that he remembered his father coming to his aunt's house on the evening his mother was shot, and that his father sent him to get his mother. He remembered returning to their house, going to sleep, and being awakened by his younger brother, "to call the police. . . . So I went to her room, and she wasn't in there. And I went up to the front and asked her what was wrong, and she told me that he [defendant] had shot her." Dayquinton gave a similar description of events that evening.

Dr. James Wyatt, a general and trauma surgeon who was the medical director of the trauma service at Moses Cone Hospital in Greensboro, testified that Ms. Smith was still conscious and speaking when she first arrived at the hospital. She told him that her ex-husband had shot her and Dr. Wyatt tried to calm her down so that he could treat her wounds. He testified that Ms. Smith's wounds could have been fatal to her, and Dr. Ernesto Votero, a neurosurgeon, agreed. Dr. Votero testified to the surgical procedures he performed to treat the wounds, and indicated that she would need future surgeries. He believed that the effects of the injuries would include permanent problems with speech, memory, and possibly movement.

Greensboro police officer M.J. Hanna testified that he arrived at the Smiths' home in the early morning hours of 29 April 2000, and waited for back-up, secured the property, and then entered the house. After securing the house, Officer Hanna asked the children, "Who did this? The victim stated to me, 'My ex-husband, Vernelle Lafarris Bullock, shot me in the face.' " Greensboro police officer J.C. Cho, arrived at the scene shortly after Officer Hanna, and entered the house with Hanna. After calling for EMS, Officer Cho attempted to talk to Ms. Smith. He testified that:

> she (Ms. Smith) had great difficulty talking. She made mention of she was having problems breathing and the blood was running down her neck or what. So I asked her what happened. And I understood her to say that it was her husband knocking on the door and she went to answer it, see what he wanted. And when she opened the door, he stepped in and started shooting. And so I asked her what is his name. And she said Vernelle Bullock. And so I turned to one of her sons to clarify the spelling of Vernelle. And he did that.

The defendant presented the testimony of two witnesses who saw him on the night of the shooting. First, Juditha Walker, defendant's girlfriend at the time, testified that defendant came over to her house in his truck on 28 April 2000 sometime between 11:00 and 11:30 p.m., wearing his work uniform. They talked for a while and then drove over to defendant's father's house in Ms. Walker's car. Ms. Walker said that they drove to a gas station on Lee Street at about 1:00 a.m., and the defendant went into the store to buy gasoline. Then, she said they returned to Ms. Walker's house and went to sleep. After defendant was arrested the next morning, Ms. Walker found defendant's work uniform in her clothes dryer.

Second, Kerianne Elseworth, the cashier at the Great Stops gas station on West Lee Street testified that at approximately 1:05 a.m. on 29 April 2000, she saw defendant and Ms. Walker at the station. Ms. Walker came into the store, where she picked up a 22-ounce Icehouse beer and a pack of Newport cigarettes. A few minutes later, the defendant came into the store, paid for the gasoline and other items, and then sat in the store with Ms. Walker smoking a cigarette. They left at 1:30 or 1:35 in the morning. The defendant did not testify.

The court instructed the jury on attempted first degree murder, possession of a handgun by a felon, and not guilty. The jury found defendant guilty of both charges. The defendant then pled guilty to having attained the status of habitual felon. The trial court found one factor in aggravation, number 19 on "Felony Judgment, Findings of Aggravating and Mitigating Factors" form, that "[t]he victim of this offense suffered serious injury that is permanent and debilitating," and found no factors in mitigation. The court sentenced defendant to consecutive prison terms of 313 months minimum and 385 months maximum for the attempted first degree murder, and to a prison term of 110 months minimum and 141 months maximum for possession of a firearm by a felon.

Defendant brings forward six assignments of error in his appeal. However, we address his third assignment of error last, as it is dispositive on the attempted murder conviction only. Our discussion of the other three issues applies to all convictions. We need not reach the fifth and sixth assignments of error, which apply only to the sentencing in the attempted first degree murder case.

[1] In his first argument, defendant contends that the trial court committed prejudicial error by denying "the defendant's objection on relevancy grounds to cross-examination questions by the State of a defense witness that implied that she had a previous altercation with the victim." Juditha Walker, defendant's girlfriend at the time of the shooting, testified that she was with defendant late on the evening of 18 April 2000 and through the morning of 19 April 2000. On cross-examination, the State questioned Ms. Walker about an altercation that she may have had with Ms. Smith prior to the shooting. Defendant objected to the questioning on the grounds that it was irrelevant; the trial court overruled the objection because the testimony bore upon the witness' possible bias.

The trial court "has broad discretion over the scope of cross-examination." *State v. Call*, 349 N.C. 382, 411, 508 S.E.2d 496, 514

(1998). The court's ruling on the scope of cross-examination will not be disturbed absent a showing of abuse of discretion. *See State v. Maynard*, 311 N.C. 1, 10, 316 S.E.2d 197, 202-03, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). "Cross-examination of an opposing witness for the purpose of showing his bias or interest is a substantial legal right. Jurors are to consider evidence of any prejudice in determining the witness' credibility." *State v. Grant*, 57 N.C. App. 589, 591, 291 S.E.2d 913, 915 (1982) (citing *State v. Hart*, 239 N.C. 709, 80 S.E.2d 901 (1954)). Here, we find that the trial court did not abuse its discretion in allowing the State to question defendant's alibi witness about events which may have revealed bias or prejudice against the victim of the crime. Defendant's first assignment of error is overruled.

[2] In his second assignment of error, defendant contends that the trial court erred in not allowing him to argue during closing arguments that someone other than defendant shot Ms. Smith. Before defendant's defense counsel began closing arguments, he informed the trial court that he intended to suggest in his argument that Mr. Smith shot Ms. Smith. The trial court instructed him not to make any such argument, because there was no direct evidence presented at trial regarding Mr. Smith as the perpetrator of the crime. Defendant duly objected to this ruling.

The scope of closing argument is governed by N.C. Gen. Stat. § 15A-1230(a) (2001) which provides that an "attorney may . . . on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." "Counsel is afforded wide latitude in his arguments to the jury." *State v. Whiteside*, 325 N.C. 389, 398, 383 S.E.2d 911, 916 (1989). However, "[t]he trial judge may limit the argument of counsel within his discretion." *Id.* In accordance with this standard, we review whether the trial court abused its discretion in not allowing defendant to argue that Mr. Smith shot Ms. Smith.

"The admissibility of evidence of the guilt of one other than the defendant is governed now by the general principle of relevancy" pursuant to Rule 401 of the North Carolina Rules of Evidence (2001). *State v. Cotton*, 318 N.C. 663, 667, 351 S.E.2d 277, 280 (1987), *aff'd*, 329 N.C. 764, 407 S.E.2d 514 (1991). "Evidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. It must point directly to the guilt of the other party." *Id.* at 667, 351 S.E.2d at 279-80. Here, there was no evidence presented that pointed directly or indirectly to the guilt of Mr.

Smith. Because there was no such evidence presented at trial, the trial court did not abuse its discretion in denying defendant's request to argue that Mr. Smith shot Ms. Smith, as it was not a "matter in issue" at the trial, within the meaning of N.C.G.S. § 15A-1230(a). Defendant's second assignment of error is overruled.

**[3]** In his fourth argument, defendant contends that he is entitled to a new trial on both convictions because the trial court improperly questioned a witness "about irrelevant matters and erroneously expressed an opinion against defendant." N.C. Gen. Stat. § 15A-1222 (2001) prohibits a judge from expressing "during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." "Because the trial judge occupies an exalted position, he must abstain from conduct or language which tends to discredit or prejudice the accused or his cause with the jury." *State v. Turner*, 66 N.C. App. 203, 207, 311 S.E.2d 331, 334 (1984) (internal citations and quotations omitted). The burden lies with the defendant to show that under the totality of the circumstances, he was prejudiced by the trial judge's comments. *See State v. Fleming*, 350 N.C. 109, 126, 512 S.E.2d 720, 732, *cert. denied*, 528 U.S. 941, 145 L. Ed. 2d 274 (1999).

Here, defendant objects to the following colloquy:

THE COURT: What are—is there any permanent effect of these injuries?

THE WITNESS: With this injury, she's going to have problem with speech. She's going to have some difficulty with the right side because as far as I know—by the time she came to the emergency room, although I didn't see her, I was told by the nurse, that she wasn't able to move the right side. She's going—might have some broken memory. And probably down the line she might require some special plate in the left side to cover up part of the brain.

THE COURT: Now, you said she may have some permanent problems with her speech?

THE WITNESS: That's correct. Yes, sir.

THE COURT: What type of problems?

THE WITNESS: Probably expression.

THE COURT: How about her movement? Being able to walk?

THE WITNESS: Well, she—as far as I know, she may be—she's still weak in the right side. The last time I saw her back in—on August 10, 2000. It's difficult to say how well she's going to be, but from this, it will take a little work to get better.

THE COURT: Do you feel like these injuries are debilitating, the ones that she received?

THE WITNESS: That's correct. Yes, sir.

This discussion occurred after the State examined Dr. Votero as to his treatment of Ms. Smith and her resulting injuries. Following this discussion, defendant cross-examined Dr. Votero as to the extent of Ms. Smith's injuries. Defendant attempted to elicit a medical opinion that anesthesia might have affected Ms. Smith's memory, but Dr. Votero rejected this suggestion.

A trial judge is not prohibited from asking a testifying witness questions during trial. "It is well recognized that a trial judge has a duty to question a witness in order to clarify his testimony or to elicit overlooked pertinent facts." *State v. Rogers*, 316 N.C. 203, 220, 341 S.E.2d 713, 723 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Here, the trial judge asked questions concerning the seriousness and permanency of Ms. Smith's injuries. He did not express an opinion concerning the defendant's guilt, nor did he make any statement tending to discredit or prejudice the defendant. We do not believe that the trial judge violated the restrictions imposed by N.C.G.S. § 15A-1222, nor that he prejudiced the defendant by his questions to the doctor. Defendant's fourth assignment of error is overruled.

[4] Finally, defendant contends that his attempted first degree murder conviction must be vacated because the underlying indictment did not sufficiently allege the essential elements of the offense or comply with the requirements for a short-form murder indictment pursuant to N.C. Gen. Stat. § 15-144 (2001). N.C.G.S. § 15-144 "Essentials of bill for homicide" states that in the body of the indictment, "it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law." Here, the indictment omitted the phrase "and of his malice aforethought." The indictment for attempted first degree mur-

der stated: "[t]he jurors for the State upon their oath present that on or about the date of the offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did attempt to kill and murder Yvonne Bullock." Defendant contends that because the indictment lacked the phrase "malice aforethought," it failed to properly allege the crime charged. We agree that the indictment fails to allege attempted first degree murder.

The purpose of an indictment is to inform the defendant of the charge against him with sufficient certainty to enable him to prepare a defense. *See State v. Gregory*, 223 N.C. 415, 27 S.E.2d 140 (1943). An indictment is insufficient if it fails to allege the essential elements of the crime charged as required by Article I, Section 22 of the North Carolina Constitution and our legislature in N.C.G.S. § 15-144. When an indictment has failed to allege the essential elements of the crime charged, it has failed to give the trial court subject matter jurisdiction over the matter, and the reviewing court must arrest judgment. *See State v. Sturdivant*, 304 N.C. 293, 307-08, 283 S.E.2d 719, 729 (1981) (citing N.C. Const. Art. I, § 22; *State v. Simpson*, 302 N.C. 613, 276 S.E.2d 361 (1981); *State v. Crabtree*, 286 N.C. 541, 212 S.E.2d 103 (1975)). We note that "the failure of a criminal pleading to charge the essential elements of the stated offense is an error of law which may be corrected upon appellate review even though no corresponding objection, exception or motion was made in the trial division." *Sturdivant*, 304 N.C. at 308, 283 S.E.2d at 729 (citing N.C. Gen. Stat. §§ 15A-1441, -1442(2)(b), -1446(d)(1) and (4)); *see also State v. Wilson*, 128 N.C. App. 688, 497 S.E.2d 416 (1998) (noting that a challenge to the sufficiency of an indictment may be made for the first time on appeal).

Here, the indictment on its face failed to include the essential element of "malice aforethought" as required by N.C.G.S. § 15-144 and *State v. Arnold*, 107 N.C. 861, 11 S.E. 990 (1890). *See also State v. Moore*, 284 N.C. 485, 202 S.E.2d 169 (1974) (noting that the element of malice is necessary to elevate the charge of manslaughter to murder, and that murder cannot be sufficiently alleged without malice). Although the Supreme Court has approved the use of the "short form" indictment authorized by N.C.G.S. § 15-144, the approved form contains allegations of malice. *See State v. Holder*, 138 N.C. App. 89, 93, 530 S.E.2d 562, 565, *review denied*, 352 N.C. 359, 544 S.E.2d 551 (2000) (holding that the United States Supreme Court's opinion in *Jones v. United States*, 526 U.S. 227, 243, 143 L. Ed. 2d 311, 319 (1999), does not invalidate North Carolina's short form indictment for

murder). For the failure to include an allegation of malice, this Court on its own motion arrests the judgment in the attempted first degree murder conviction. *See State v. Hadlock*, 34 N.C. App. 226, 228, 237 S.E.2d 748, 749 (1977); *see also Wilson*, 128 N.C. App. at 691, 497 S.E.2d 419. Often, "[t]he legal effect of arresting the judgment is to vacate the verdict and sentence of imprisonment below, and the State, if it is so advised, may proceed against the defendant upon a sufficient bill of indictment." *State v. Fowler*, 266 N.C. 528, 531, 146 S.E.2d 418, 420 (1966); *see also State v. Covington*, 267 N.C. 292, 148 S.E.2d 138 (1966).

However, where the indictment does sufficiently allege a lesser-included offense, we may remand for sentencing and entry of judgment thereupon. Voluntary manslaughter consists of an unlawful killing without malice, premeditation or deliberation. *See State v. Robbins*, 309 N.C. 771, 777, 309 S.E.2d 188, 191 (1983). Because the jury's verdict of attempted first degree murder necessarily means that they found all of the elements of the lesser-included offense of attempted voluntary manslaughter, we remand this case to the trial court for sentencing and entry of judgment for attempted voluntary manslaughter. *See Wilson*, 128 N.C. App. at 696, 497 S.E.2d 422 (remanding defendant's case to the trial court for imposition of judgment on false imprisonment as a lesser-included offense of kidnapping, because all of the elements of false imprisonment were alleged in the indictment).

We recognize that our Supreme Court in *State v. Coble*, 351 N.C. 448, 527 S.E.2d 45 (2000), has held that attempted second degree murder is not cognizable in North Carolina and likewise signaled, without specifically deciding, that it would likely hold the same way as to attempted voluntary manslaughter. 351 N.C. at 450-53, 527 S.E.2d at 47-49. However, more recently this Court has carefully analyzed the issue and specifically held "that attempted voluntary manslaughter is (1) a crime in North Carolina, and, (2) a lesser-included offense of attempted first-degree murder." *State v. Rainey*, 154 N.C. App. ——, ——, —— S.E.2d ——, —— (2002). Thus, when the evidence supports it, an instruction may be given and, if the jury convicts, a judgment of attempted voluntary manslaughter entered. Here, where the jury found defendant to have been guilty of all elements of attempted first degree murder, including specific intent, but where the indictment does not support that offense, we conclude that the trial court may enter judgment on the lesser-included offense of attempted voluntary manslaughter.

No error in case number 00 CRS 23567 (habitual felon status) and number 00 CRS 23566 (possession of a firearm by a felon).

Judgment arrested on attempted first degree murder; remanded for sentencing and entry of judgment on attempted voluntary manslaughter.

Chief Judge EAGLES and Judge BRYANT concur.