**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-1

JOHNNY WAYNE HYDE,

                    Petitioner - Appellant,

          v.

GERALD J. BRANKER, Warden, Central Prison,

                    Respondent - Appellee.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  James C. Dever III,
District Judge.  (5:06-hc-02032-D)

Argued:  May 13, 2008              Decided:  June 30, 2008

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Jonathan Lee Megerian, MEGERIAN & WELLS, Asheboro, North
Carolina, for Appellant.  Edwin William Welch, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON
BRIEF:** Paul M. Green, Durham, North Carolina, for Appellant.  Roy
Cooper, North Carolina Attorney General, Raleigh, North Carolina,
for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Johnny Wayne Hyde, sentenced to death for the first-degree murder of Leslie Egbert Howard, seeks a writ of habeas corpus to vacate his conviction and death sentence. The district court denied habeas relief; we affirm.


                                   I.

The Supreme Court of North Carolina found the following facts. See State v. Hyde, 530 S.E.2d 281, 285-87 (N.C. 2000).

On the evening of August 1, 1996, Hyde, James Blake, and Joel Coleman were drinking at a shed near Hyde's house. Blake and Coleman decided to break into Leslie Howard's mobile home to steal drugs, and Hyde agreed to help. They gathered assorted tools and weapons from Hyde's shed, walked to the mobile home, pried the door open, and entered. After walking down a hallway to the bedroom, they encountered Howard sitting up in bed. Howard lunged at Hyde, and Hyde stabbed Howard several times with a knife. Howard fell to his knees, either Blake or Coleman hit him with a pipe in the back of his head, and Hyde stabbed him several times in the back and in the side with a drill bit. Hyde then started to cut Howard's throat with a hand saw, but became nauseated by the blood and foul smell. Coleman took over.

Believing that a car was approaching, Hyde, Coleman, and Blake fled the scene. In order to remove blood stains, Blake set the

                                   2

weapons on fire in a barrel and then placed them in the trash to be picked up the next day. When Hyde returned to his residence, his sister asked what had happened and helped him wash the blood from his clothes. Howard's father discovered his son's body the next day; the paramedics determined that stab wounds to the chest and abdomen, blunt trauma to the head, and massive lacerations to the neck caused Howard's death. When the police questioned Hyde, he initially denied any involvement, but eventually admitted his participation in the murder.

After finding Hyde guilty of first-degree murder, first-degree burglary, and conspiracy to commit first-degree burglary, a North Carolina jury recommended a death sentence; and the court imposed this sentence. On direct appeal, the Supreme Court of North Carolina affirmed Hyde's conviction and sentence, see Hyde, 530 S.E.2d 281, and the United States Supreme Court denied Hyde's petition for certiorari, Hyde v. North Carolina, 531 U.S. 1114 (2001).

Hyde filed a post-conviction motion for appropriate relief ("MAR") in state court in Onslow County, North Carolina. After conducting an evidentiary hearing on Hyde's claim of ineffective assistance of counsel, the MAR court entered an order denying the motion for relief. Hyde petitioned the Supreme Court of North Carolina for review, which it denied. See State v. Hyde, 623 S.E.2d 779 (N.C. 2005).

3

Hyde then filed the instant petition for writ of habeas corpus. The district court denied Hyde's request for an evidentiary hearing, granted the state's motion for summary judgment on all claims, and dismissed Hyde's petition for habeas relief. See Hyde v. Branker, No. 5:06-HC-2032-D (E.D.N.C. Sept. 25, 2007). The district court later denied Hyde's motion to alter or amend the judgment, and denied Hyde's motion for a certificate of appealability. We granted Hyde a certificate of appealability as to the seven issues discussed below.

We review de novo the district court's grant of summary judgment, applying the same legal standard as the district court. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may grant habeas relief only if the state court rejected Hyde's constitutional claims in a decision that was contrary to, or involved an unreasonable application of, Supreme Court precedent, or that was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d) (2000).

## II.

Hyde first claims that the state court erred in denying his motion to suppress a confession that he made to police officers during a custodial interrogation.

A confession made during a custodial interrogation must be suppressed unless police advise the defendant of his rights under

4

Miranda v. Arizona, 384 U.S. 436 (1966), and he knowingly and intelligently waives those rights.  Additionally, to be admissible, a confession must be voluntary.  Blackburn v. Alabama, 361 U.S. 199, 205 (1960).

At trial, Hyde moved to suppress his confession, arguing that it was involuntary and that he did not knowingly and intelligently waive his Miranda rights; after holding a hearing, the state trial court denied the motion.  On direct appeal, the Supreme Court of North Carolina affirmed, finding that Hyde's confession was voluntary and that he knowingly and intelligently waived his Miranda rights.  Hyde, 530 S.E.2d at 287-88.  The district court found the state court's denial of Hyde's motion was not based on an unreasonable determination of the facts or an unreasonable application of Supreme Court precedent.  Hyde claims that the record as a whole does not support the state court's factual findings and that the state court's application of Supreme Court precedent was unreasonable.

The state court found that police twice advised Hyde of his Miranda rights and that Hyde waived them orally and in writing. Hyde, 530 S.E.2d at 287.  The court further found that Hyde waited in a locked interview room for approximately one hour before being interrogated; during this time, officers took him to the bathroom at his request.  Id.  While waiting in the interview room, an officer told Hyde that "it would be best if [Hyde] told the truth

5

because the truth would come out anyway and it would take a load off of him." Id. Police then moved Hyde to a conference room and advised him of his rights for the second time. Id. Hyde again agreed to speak with police and, during the subsequent two-hour interview, admitted his role in the murder. Id.

Hyde notes that at the state court hearing on his motion to suppress, he testified that he read and signed the rights waiver form but that it was not read out loud to him; he also testified that his interrogators told him that if he cooperated with them they would tell the prosecutors and "they would take it lighter on [him]." As Hyde acknowledges, at the same hearing, a law enforcement witness directly contradicted him and testified that Hyde's rights were read aloud to him and that no police officer made a statement that he would tell the prosecutor to go easier on Hyde if he confessed. Another law enforcement officer testified that he might have told Hyde that "it would take a load off of his shoulders if he would be honest because the truth would come out," but he never promised or threatened Hyde in any way. Given this contradictory testimony, Hyde cannot show by clear and convincing evidence that the state court's factual findings are incorrect, 28 U.S.C. § 2254(e)(1), nor that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented, id. § 2254(d)(2).

The state court concluded that Hyde knowingly and intelligently waived his rights and that his confession was voluntary. In so holding, the court explicitly rejected Hyde's claim that the police officer's statement that it would be best if Hyde told the truth constituted an implicit promise that he would receive some benefit for confessing. Hyde, 530 S.E.2d at 288. This was not an unreasonable application of Supreme Court precedent.

III.

Hyde next argues that the Supreme Court of North Carolina erred in finding that the state trial court did not violate his constitutional rights when it excused several prospective jurors during consideration of hardship requests.

A sentence of death cannot stand if the jury that recommended it was chosen by excluding potential jurors for cause simply because they voiced general conscientious or religious scruples against the death penalty. Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). Hyde argues that the trial court excused three potential jurors because, during the court's consideration of hardship requests, they expressed general religious scruples about serving on a jury. Two of these jurors also gave health or personal reasons justifying their inability to serve; one gave only a religious reason, stating that she felt she "ha[d] no right to

7

judge anyone." Hyde acknowledges that all three jurors were excused before any case was called and before the jury pool was sworn. He argues, however, that since the court excused them _immediately_ before jury selection in his case began, both the court and the prospective jurors realized that the jurors could be selected to hear a capital case, and therefore in excusing at least one juror for general religious concerns, the trial court violated _Witherspoon_. The state court rejected this claim on the merits. See _Hyde_, 530 S.E.2d at 291-92.[*] Hyde contends that this decision both violated, and constituted an unreasonable application of, _Witherspoon_.

We disagree. _Witherspoon_ involved a decision to excuse a juror for cause based on "general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522 (emphasis added). Here, the potential jurors indicated religious scruples about serving on a

---

[*]Hyde argues that the state court did not rule on his _Witherspoon_ claim because it did not specifically cite and discuss _Witherspoon_. According to Hyde, the district court should therefore have considered his _Witherspoon_ claim _de_ _novo_, rather than under AEDPA's deferential standard of review applicable to state court decisions on the merits. See 28 U.S.C. § 2254(d)(1). Although Hyde is correct that the state court did not cite _Witherspoon_, it clearly did decide his claim on the merits. See _Hyde_, 530 S.E.2d at 291. As the district court held, a state court need only decide an issue on the merits, it need not cite specifically to Supreme Court cases for the AEDPA standard to apply. See _Bell v. Jarvis_, 236 F.3d 149, 160 (4th Cir. 2000) (en banc).

8

jury and passing judgment generally; no Supreme Court precedent directly addresses this broader question.

Moreover, Witherspoon dealt with a decision to excuse a juror for cause during voir dire rather than a hardship request prior to voir dire. Although the Supreme Court has made clear that voir dire is a critical stage of a criminal trial during which the defendant has a constitutional right to be present, see, e.g., Gomez v. United States, 490 U.S. 858, 872-73 (1989), the Court has not extended this holding to the consideration of hardship requests made prior to voir dire. It is true, as Hyde notes, that some precedent from other circuits treats questioning that occurs prior to voir dire as analogous to voir dire itself, based on the substance of the questioning. See, e.g., United States v. Bordallo, 857 F.2d 519, 523 (9th Cir. 1988). But the AEDPA requires us to look to "clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1); no Supreme Court precedent holds that a court commits constitutional error in this sort of questioning of potential jurors prior to voir dire.

Thus, we cannot say that the state court violated or unreasonably applied Witherspoon in the present case.

IV.

Hyde maintains that the state appellate court also violated or unreasonably applied Supreme Court precedent in rejecting his claim that the trial court impermissibly restricted defense questions during voir dire.

A capital defendant is constitutionally entitled to voir dire sufficient to discern whether a juror has predetermined to impose the death penalty regardless of the facts and circumstances of conviction. See Morgan v. Illinois, 504 U.S. 719, 735-36 (1992). Hyde argues that the trial court unconstitutionally restricted his questioning of three potential jurors. Hyde exercised a peremptory challenge to excuse one of these jurors, but allowed the two other jurors to be impaneled without having exhausted his remaining peremptory challenges.

The Supreme Court of North Carolina rejected this claim. That court found that even if the trial court had impermissibly restricted Hyde's questioning of these three jurors, Hyde could not demonstrate prejudice because he had not exhausted his peremptory challenges. See Hyde, 530 S.E.2d at 292.

Hyde's challenge to this ruling must fail. During voir dire, Hyde questioned all three jurors as to their views on the death penalty and whether they would automatically impose it in all circumstances; while the trial court did sustain objections to some of Hyde's questions, it allowed others. Hyde recognizes that the

10

failure to allow a question during voir dire violates due process only when it would render the trial "fundamentally unfair." See Mu'Min v. Virginia, 500 U.S. 415, 425-26 (1991). Given that Hyde was allowed to question all three jurors as to their views on the death penalty, we cannot say that the state court decision constitutes a violation or an unreasonable application of Supreme Court precedent.

Moreover, the state court's holding that Hyde could not show prejudice because he did not exhaust his peremptory challenges does not violate, or constitute an unreasonable application of, Supreme Court precedent. Citing Gray v. Mississippi, 481 U.S. 648, 665 (1987), Hyde argues that, in order to demonstrate prejudice, he did not have to exhaust his peremptory challenges or show that a biased juror had actually been seated, but only had to show that the alleged error could possibly have affected composition of the jury panel as a whole. But Gray addresses the relevance of unexercised peremptory challenges in the specific context of the erroneous Witherspoon exclusion of a prospective juror. Id. at 664-65. The following year, in Ross v. Oklahoma, the Supreme Court explicitly "decline[d] to extend the rule of Gray beyond its context: the erroneous 'Witherspoon exclusion' of a qualified juror in a capital case." 487 U.S. 81, 87 (1988). Because none of the prospective jurors in this case were excluded in violation of Witherspoon, Gray does not control. Hence, this argument also fails.

11

V.

Hyde next argues that the state court violated clearly established Supreme Court precedent in rejecting his contention that insufficient evidence supported the jury finding as to one of the aggravating circumstances -- that the murder was committed for the purpose of avoiding arrest.

An aggravating circumstance may not be submitted to the jury if the evidence, viewed in the light most favorable to the prosecution, is insufficient to prove the aggravating circumstance beyond a reasonable doubt. Lewis v. Jeffers, 497 U.S. 764, 781-82 (1990). One aggravating circumstance submitted to the jury in Hyde's case was whether at least one of the purposes motivating the murder was "avoiding or preventing a lawful arrest." N.C. Gen. Stat. § 15A-2000(e)(4) (1999). Hyde contends that the evidence was insufficient to submit this aggravating circumstance to the jury, and he argues that because his death sentence was imposed on the basis of this assertedly insufficient evidence, it is unconstitutionally arbitrary under Woodson v. North Carolina, 428 U.S. 280 (1976), and Furman v. Georgia, 408 U.S. 238 (1972).

The state court rejected this claim on the merits. See Hyde, 530 S.E.2d at 293-94. It found that two of Hyde's statements -- one to police officers and another to his girlfriend, Ginger Guthrie -- tended to show that Hyde killed Howard because he believed Howard would report him to the authorities. See Hyde, 530

12

S.E.2d at 294.  Hyde argues that the statements show only a post-hoc awareness that Howard's death prevented him from reporting the crime and that this does not suffice to establish the aggravating circumstance under North Carolina law.

Hyde is correct that, under North Carolina law, the evidence of this aggravating circumstance must relate to the defendant's state of mind at the time of the offense; evidence of post-hoc awareness that the victim's death prevented the victim from reporting a crime does not suffice.  See, e.g., State v. Williams, 284 S.E.2d 437, 456 (N.C. 1981).  However, Hyde errs in contending that his statements can only be read to show his post-hoc awareness.  The state court, not unreasonably, determined that both statements tended to show Hyde's intent at the time of the murder. See Hyde, 530 S.E.2d at 294.  Additionally, evidence in the record indicates that Hyde knew Howard well, which suggests that Howard would have been able to identify Hyde had his attackers not killed him.

The state court's determination that this evidence sufficed to submit determination of the aggravating circumstance to the jury does not violate clearly established Supreme Court precedent.

VI.

Hyde additionally contends that the trial court erred by failing to intervene ex mero motu when the prosecutor made an

13

allegedly improper closing argument that asked the jury to consider an aggravating factor not recognized under North Carolina law.

Hyde maintains that the prosecutor's closing argument essentially asked the jury to consider as an aggravating factor in support of the death penalty that the victim was killed in his own home. Hyde notes that this is not an aggravating factor established by North Carolina law and argues that allowing the jury to sentence him to death on the basis of an unauthorized aggravating factor rendered his trial so unfair as to deny him due process.

The Supreme Court of North Carolina found, and Hyde does not dispute, that Hyde failed to object to the prosecutor's closing argument during trial. For this reason, that court found that Hyde had failed to preserve his claim and therefore reviewed it only for plain error. See Hyde, 530 S.E.2d at 294. The district court found that Hyde's claim was procedurally barred; in the alternative, it found that the claim failed on the merits.

Federal habeas courts may not review the merits of a claim found to be procedurally barred by a state court on adequate and independent state grounds. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). The district court found that Hyde's claim was procedurally barred because the state court did not consider it on the merits. Hyde argues that the state court did consider his claim on the merits because it reviewed for plain error, applying

14

the due process standard from <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986). But we have explicitly held that the North Carolina state court's review for fundamental unfairness under <u>Darden</u> does not constitute an adjudication on the merits sufficient to preserve a claim for federal habeas review. <u>See</u> <u>Daniels v. Lee</u>, 316 F.3d 477, 487-88 (4th Cir. 2003).

However, Hyde alternatively argues that here the state procedural ground cannot be considered <u>independent</u> because the state court used the due process standard from <u>Darden</u>. This is a much more difficult question. <u>See</u> <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985) ("[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and [federal habeas] jurisdiction is not precluded.") We need not reach this question in the present case, however, because Hyde's claim fails on the merits.

To prove constitutional error based on the prosecutor's closing argument, Hyde must show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden</u>, 477 U.S. at 181 (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)). In this case, the prosecutor did repeatedly emphasize that Hyde killed Howard in his home and did explicitly state that Hyde deserved the death penalty based on this "factor." However, as the state court

15

noted, one of the aggravating factors that was submitted to the jury was that the murder was committed in the course of a burglary, and an element of burglary under North Carolina law is that the dwelling be occupied at the time of the intrusion. Hyde, 530 S.E.2d at 294-95. Therefore, the closing argument did not amount to submission of an unauthorized aggravating factor to the jury, and so the state court did not unreasonably apply Darden in finding that Hyde's trial was not fundamentally unfair.

## VII.

Hyde next argues that the jury instructions allowed the jury to accord no weight at all to statutory mitigating circumstances and that, as a result, his sentence was unconstitutionally arbitrary under Furman v. Georgia, 408 U.S. 238 (1972), and its progeny.

In a capital case, a jury or court imposing sentence may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis in original). Moreover, the sentencing authority "may determine the weight to be given relevant mitigating evidence." Eddings v. Oklahoma, 455 U.S. 104, 114 (1982). "But

16

[it] may not give [this evidence] no weight by excluding such evidence from [its] consideration." Id.

A North Carolina statute lists a number of mitigating factors that a jury must consider and give some weight to, if established by a preponderance of the evidence. See State v. Jaynes, 464 S.E.2d 448, 470 (N.C. 1995). A jury may also consider non-statutory factors, but may choose to find that non-statutory factors have no mitigating value even if established by a preponderance of evidence. See, e.g., State v. Fullwood, 373 S.E.2d 518, 533 (N.C. 1988), vacated on other grounds, 494 U.S. 1022 (1990).

Hyde argues that the jury instructions allowed the jury to find that statutory mitigating factors existed but carried no mitigating value, in violation of Eddings as well as state law. The state trial court did not accept Hyde's proposed jury instructions, which explicitly instructed the jury on the difference between statutory and non-statutory mitigating circumstances and then directed the jury to assign some weight to any statutory mitigating circumstance established by a preponderance of the evidence. But the court did instruct the jury to find every statutory factor established by a preponderance of evidence, and to find any additional, non-statutory factors established by a preponderance of evidence, if the jury found the facts to possess mitigating value. The court then instructed the

17

jury to weigh all existing mitigating factors against the existing aggravating factors in determining the sentence.

These jury instructions do not constitute an unreasonable application of Eddings and Lockett. As Hyde acknowledges, the jury instructions do not preclude the jury from considering any mitigating factors -- indeed, the court explicitly instructed the jury to consider not only statutory mitigating circumstances but also "any other circumstance . . . which you deem to have mitigating value." A challenged instruction will be held erroneous only if "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." See Boyde v. California, 494 U.S. 370, 380 (1990). In view of the instructions in this case, we do not believe it reasonably likely that the jury thought it could refuse to consider any mitigating evidence.

## VIII.

Finally, Hyde argues that his trial counsel was constitutionally ineffective in failing to present a voluntary intoxication defense at the guilt phase of the trial and in failing to prepare expert witnesses regarding intoxication at the sentencing phase of the trial.

To establish constitutionally ineffective assistance of counsel, a petitioner must show that counsel's representation fell

18

below an objective standard of reasonableness and that there is a reasonable probability that, but for the ineffective assistance, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694 (1984). Hyde first raised his ineffective assistance claims post-conviction in a motion for appropriate relief in state court; after holding an evidentiary hearing, the state post-conviction court denied his claims on the merits.

Hyde does not argue that the facts found by the post-conviction court are unreasonable in light of the evidence. Rather, Hyde picks and chooses from these facts to support his ineffective assistance claim. When we view the facts that Hyde correctly recites with others that he omits, we cannot conclude that the state post-conviction court unreasonably applied Supreme Court precedent in rejecting Hyde's ineffective assistance motion.

Hyde acknowledges that the evidence as to his intoxication was conflicting and he acknowledges that he told his counsel repeatedly that he had only had two beers on the night in question. However, Hyde argues that testimony from three witnesses -- Hyde's girlfriend, Ginger Guthrie; Hyde's co-defendant, Coleman; and the girlfriend of Hyde's co-perpetrator, Dana Knaul -- indicated that he had more than that to drink and had also ingested Xanax and/or marijuana. Hyde argues that under Rompilla v. Beard, 545 U.S. 374 (2005), his trial counsel could not simply rely on his statements

19

regarding his level of intoxication and were required to make further inquiries regarding his possible intoxication.

The facts found by the state court reveal that the same primary concern underlay counsel's strategic decisions not to present a voluntary intoxication defense or advise the expert witnesses of the circumstances of the crime. Hyde admitted to his trial counsel that he, Blake, and Coleman had gone to the victim's trailer not once but twice the night of the murder, and that they made the second trip with the express purpose of killing Howard in order to prevent him from reporting their attack. Trial counsel believed (apparently correctly) that the prosecution did not know of the second trip and sought at all costs to prevent the prosecutor from learning this information, because it would only strengthen the state's case for the death penalty. Defense counsel decided not to advise the expert witnesses as to the circumstances of the crime because counsel knew that on cross-examination, the experts would have to divulge this information.

Trial counsel also testified before the state post-conviction court that they were aware of the statements by Knaul and Coleman that Hyde had more than just two beers on the night of the murder. However, Coleman's statement did not indicate the amount or type of drugs Hyde consumed, so counsel thought it would not be very helpful. Knaul's statement was more specific; however, counsel was aware that Knaul also knew that Hyde and the others had made the

20

second trip for the purpose of killing the victim, and they wanted to avoid having her testify at trial because they did not want that information revealed. Trial counsel tried to contact Guthrie, then a minor, but her father would not allow her to speak with them before trial, so they had no idea what she would say if she testified.

Trial counsel further testified that they seriously considered presenting a voluntary intoxication defense, but rejected that option for several reasons. In addition to the problems with all of the potential testimony regarding Hyde's level of intoxication discussed above, counsel was aware that Hyde had presented a detailed statement to officers concerning the events on the night of the crime, and Hyde's ability to give such a detailed statement made it difficult to argue that Hyde had been too intoxicated to form the requisite intent. Moreover, both defense attorneys testified that they had had extensive experience trying capital cases before Onslow County juries and had found that such juries generally rejected voluntary intoxication defenses. Hyde's counsel essentially made the strategic choice to try to preserve their credibility with the jury by not asserting a defense they thought would fail, in the hopes of persuading the jury at sentencing to spare Hyde's life.

Based on the facts found by the MAR court, which Hyde does not contest, it was not an unreasonable application of Supreme Court

precedent to find Hyde's counsel not constitutionally ineffective. See <u>Florida v. Nixon</u>, 543 U.S. 175 (2004) (finding trial counsel was not per se ineffective for conceding guilt in capital case, and approving of strategic decision to maintain credibility with the jury for sentencing).

## IX.

For all of the reasons set forth above, the judgment of the district court is

<u>AFFIRMED</u>.